United States Court of Appeals,

Eleventh Circuit.

No. 94-6845.

Jack COTTRELL, Reverend, as Administrator of the Estate of Leroy Bush Wilson, Plaintiff-Appellee,

v.

Cynthia D. CALDWELL, individually and in her official capacity as a City of Montgomery Police Officer; S.E. Wilson, Corporal, individually and in his official capacity as a City of Montgomery Police Officer; Eugene S. Kemplin, individually and in his official capacity as a City of Montgomery Police Officer; Spencer T. Henderson, II, individually and in his official capacity as a City of Montgomery Police Officer, Defendants-Appellants,

The City of Montgomery, a municipal corporation; the Chief of Police, City of Montgomery, in his official capacity, Defendants.

June 3, 1996.

Appeal from the United States District Court for the Middle District of Alabama. (No. CV-92-A-1584-N), W. Harold Albritton, III, Judge.

Before TJOFLAT, Chief Judge, and CARNES, Circuit Judge.[*]

CARNES, Circuit Judge:

This case arises out of the death of Leroy Bush Wilson from positional asphyxia as he was being transported in the back of a police car after his arrest. Reverend Jack Cottrell, the administrator of the decedent's estate, filed suit under 42 U.S.C. § 1983 alleging that four police officers who arrested or transported Wilson, the police department, and the City of Montgomery had violated his constitutional rights. The district court denied the defendant police officers' qualified immunity summary judgment motion, and the officers brought this

---

[*]Senior Circuit Judge Frank M. Johnson heard argument in this case but did not participate in this decision. This decision is rendered by quorum. 28 U.S.C. § 46(d).

interlocutory appeal from that denial.  We reverse.

## I. THE INTERLOCUTORY JURISDICTION ISSUE

In light of *Johnson v. Jones,* --- U.S. ----, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995), we deem it prudent to examine our jurisdiction to decide this interlocutory appeal.  We begin with certain general principles involving interlocutory jurisdiction in qualified immunity cases.  In this context, we use the term "interlocutory jurisdiction" to refer to interlocutory appellate jurisdiction pursuant to the *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), doctrine, as applied to qualified immunity cases in *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).  That jurisdiction exists independently of the final judgment rule exceptions contained in 28 U.S.C. § 1292 and Fed.R.Civ.P. 54(b).

We have no interlocutory jurisdiction to review the *grant* of summary judgment to a defendant on qualified immunity grounds. *Winfrey v. School Bd. of Dade County, Fla.,* 59 F.3d 155, 158 (11th Cir.1995).  Whether we have interlocutory jurisdiction to review the *denial* of summary judgment on qualified immunity grounds depends on the type of issues involved in the appeal.

One type of issue for these purposes is evidentiary sufficiency:  whether the district court erred in determining that there was an issue of fact for trial about the defendant's actions or inactions which, if they occurred, would violate clearly established law.  An example is the situation in *Johnson v. Jones,* --- U.S. at ---- - ----, 115 S.Ct. at 2153-54, where the defendant police officers sought to appeal interlocutorily the district

court's determination that there was sufficient evidence from which the trier of fact could find that the defendant officers participated in beating the plaintiff after he was arrested, or stood by and allowed others to beat him. We know from *Johnson v. Jones* that we do not have interlocutory jurisdiction to review the denial of summary judgment where the only issues appealed are evidentiary sufficiency issues. --- U.S. at ----, 115 S.Ct. at 2156; *see also Dolihite v. Maughon By and Through Videon,* 74 F.3d 1027, 1033 n. 3 (11th Cir.1996); *Johnson v. Clifton,* 74 F.3d 1087, 1091 (11th Cir.1996), *petition for cert. filed,* 64 U.S.L.W. 3742 (U.S. Apr. 25, 1996) (No. 95-1743).

Legal issues underlying qualified immunity decisions are a different matter. An example of such an issue is "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, ... whether the law clearly proscribed the actions the defendant claims he took." *Mitchell v. Forsyth,* 472 U.S. at 528, 105 S.Ct. at 2816. In the *Mitchell* case itself the specific legal issue was whether the defendant's actions in authorizing, as Attorney General, a warrantless national security wiretap were proscribed by clearly established law when those actions occurred in November of 1970. *Id.* at 530, 105 S.Ct. at 2817-18. We know from *Mitchell,* which *Johnson* left intact, that we have interlocutory jurisdiction over legal issues that are the basis for a denial of summary judgment on qualified immunity grounds. *See Dolihite,* 74 F.3d at 1034 n. 3; *Clifton,* 74 F.3d at 1091; *Haney v. City of Cumming,* 69 F.3d 1098, 1101 (11th Cir.1995), *cert. denied,* --- U.S. ----, --- S.Ct. ----,

--- L.Ed.2d ----, 64 U.S.L.W. 3669 (U.S., May 20, 1996) (No. 95-1527); *McElroy v. City of Macon,* 68 F.3d 437, 438 n. * (11th Cir.1995). Recently, this Court has referred to such legal issues as "core qualified immunity" issues. *Clifton,* 74 F.3d at 1091; *Dolihite,* 74 F.3d at 1034 n. 3.

The Supreme Court's decision in *Behrens v. Pelletier,* --- U.S. ----, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), earlier this year, made it clear that interlocutory appellate jurisdiction over the legal issues involved in a qualified immunity question exists even where the district court denied the summary judgment "motion with the unadorned statement that "[m]aterial issues of fact remain as to [the defendant] on the [federal question] claim.' " --- U.S. at ----, 116 S.Ct. at 838 (second and third alterations added). The Court in *Behrens* specifically rejected the contention that a district court's holding that material issues of fact remain bars interlocutory appellate review of related issues of law, labelling that contention a misreading of *Johnson. Id.* at ----, 116 S.Ct. at 842. As the Court explained, " *Johnson* held, simply, that determinations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case;" but " *Johnson* reaffirmed that summary-judgment determinations are appealable when they resolve a dispute concerning an abstract issue of law relating to qualified immunity—typically, the issue whether the federal right allegedly infringed was clearly established." *Id.* (citations, internal quotation marks, and brackets omitted). The contrary holdings in *Mastroianni v. Bowers,* 74 F.3d 236, 238 (11th Cir.1996), and *Babb*

*v. Lake City Community College,* 66 F.3d 270, 272 (11th Cir.1995), preceded *Behrens* and cannot be reconciled with it. Where prior panel precedent conflicts with a subsequent Supreme Court decision, we follow the Supreme Court decision. *E.g., Lufkin v. McCallum,* 956 F.2d 1104, 1107 (11th Cir.1992) ("A panel of this Court may decline to follow a decision of a prior panel if such action is necessary in order to give full effect to an intervening decision of the Supreme Court of the United States."), *cert. denied,* 506 U.S. 917, 113 S.Ct. 326, 121 L.Ed.2d 246 (1992).

Accordingly, under *Johnson,* we lack interlocutory appellate jurisdiction over the denial of summary judgment on qualified immunity grounds where the sole issues on appeal are issues of evidentiary sufficiency. However, as clarified by *Behrens, Johnson* does not affect our interlocutory jurisdiction in qualified immunity cases where the denial is based even in part on a disputed issue of law.

In *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991), the Court explained that "[a] necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is "clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." That issue, too, is a legal one and therefore subject to interlocutory review.[1]

----

[1]Our discussion of the types of issues for purposes of our interlocutory jurisdiction is not meant to be exhaustive. For example, when the claim is that a search and seizure or arrest violated the Fourth Amendment, qualified immunity depends upon whether arguable probable cause existed. More specifically, the

The present case involves two legal claims against the defendant officers arising out of the same facts. The first alleges that they violated the Fourteenth Amendment due process right of Leroy Wilson not to be subjected to conditions of custody and confinement creating an unreasonable danger to his safety and life. The district court denied the defendant officers' motion for summary judgment on qualified immunity grounds as to that claim based upon its application of an " *either* gross negligence *or* deliberate indifference" standard. (Emphasis added.) In reviewing whether that denial was error, we must of necessity decide whether the legal standard upon which the denial was based is the correct one, and that is an issue of law. Accordingly, we have interlocutory jurisdiction over the appeal from the denial of summary judgment as to the first claim.

Plaintiff's second claim is that the defendant officers used excessive force to arrest him, in violation of the Fourth Amendment. The district court declined to rule on the defendants' motion for qualified immunity summary judgment as to that claim, stating only that in view of its rejection of the defense as to the due process claim "prudence dictates" that it also reject the defense as to the Fourth Amendment claim. The issue of whether that is a proper basis for denying summary judgment, and the

---

qualified immunity issue in such cases is not whether probable cause existed, but whether a reasonable officer possessing the information the defendant officer possessed could have believed it did. *E.g., Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991); *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987); *Swint v. City of Wadley, Ala.,* 51 F.3d 988, 996 (11th Cir.1995). That is a core qualified immunity issue.

related issue of whether summary judgment should have been granted on qualified immunity grounds based upon the facts of this case are issues of law. Accordingly, we have interlocutory jurisdiction over the appeal from the denial of summary judgment as to the second claim.

## II. APPELLATE REVIEW OF EVIDENTIARY ISSUES RELATING TO QUALIFIED IMMUNITY IN THE POST-*JOHNSON* ERA

When it decides whether defendants are entitled to summary judgment, a district court draws the facts from the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," Fed.R.Civ.P. 56(c), construing the evidence from those sources in the light most favorable to the plaintiff. *See, e.g., Forbus v. Sears Roebuck & Co.,* 30 F.3d 1402, 1403 n. 1 (11th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 906, 130 L.Ed.2d 788 (1995); *Akin v. PAFEC Ltd.,* 991 F.2d 1550, 1553 n. 1 (11th Cir.1993).

Having done that, the district court in this case set out in its order denying summary judgment the "facts" upon which that denial was based. As this Court has noted, what is considered to be the "facts" at the summary judgment stage may not turn out to be the actual facts if the case goes to trial, but those are the facts at this stage of the proceeding for summary judgment purposes. *See, e.g., Swint,* 51 F.3d at 992; *Rodgers v. Horsley,* 39 F.3d 308, 309 (11th Cir.1994); *Kelly v. Curtis,* 21 F.3d 1544, 1546 (11th Cir.1994).

A. The Court of Appeals' Role In Regard to the Determination of the Facts When It Reviews the Denial of a Motion for Summary Judgment on Qualified Immunity Grounds

When a court of appeals interlocutorily reviews a legal issue

involved in a denial of summary judgment on qualified immunity grounds, a question that arises in the wake of *Johnson v. Jones* is what role, if any, the appellate court has in determining the facts for summary judgment purposes. In the past, we have reviewed the district court's evidentiary sufficiency determinations *de novo,* undertaking to examine the record and decide for ourselves what the facts are at this stage. *See Rogers v. Miller,* 57 F.3d 986, 988 (11th Cir.1995); *Swint,* 51 F.3d at 992; *Rodgers,* 39 F.3d at 309. The Supreme Court's *Johnson* decision raised some doubt about the correctness of that approach, but that doubt has been resolved in recent decisions of this Court. In both *Clifton,* 74 F.3d at 1091, and *Dolihite,* 74 F.3d at 1034-35 n. 3, this Court held that the Supreme Court's *Johnson v. Jones* decision did not affect this Court's authority to decide, in the course of deciding the interlocutory appeal, those evidentiary sufficiency issues that are part and parcel of the core qualified immunity issues, *i.e.,* the legal issues.[2] Our *Clifton* and *Dolihite* holdings in this respect are consistent with the Supreme Court's opinion in *Behrens,* --- U.S. at ----, 116 S.Ct. at 842.

In exercising our interlocutory review jurisdiction in qualified immunity cases, we are not required to make our own determination of the facts for summary judgment purposes; we have discretion to accept the district court's findings, if they are

_____

[2]To the extent, if any, that *Heggs v. Grant,* 73 F.3d 317 (11th Cir.1996), implies to the contrary, the implication is only dictum. In that case, the parties were "in full agreement that the events described" in the opinion "accurately portray what happened" and, thus, the decision was based upon "undisputed facts." *Id.* at 320.

adequate.[3] *See Johnson v. Jones,* --- U.S. at ----, 115 S.Ct. at 2159 ("the court of appeals can simply take, as given, the facts that the district court assumed when it denied summary judgment"); *Dolihite,* 74 F.3d at 1035 n. 3. But we are not required to accept them. In this case, we will accept the district court's evidentiary sufficiency findings, *i.e.,* its factfindings for present purposes, as far as they go, supplementing them with additional evidentiary sufficiency findings of our own from the record where necessary.

B. The Right of a Defendant Denied Summary Judgment on Qualified Immunity Grounds to Have the Facts Determined at Trial and Evidentiary Sufficiency Issues Reviewed on Appeal After Final Judgment

Before recounting the facts the district court distilled from the summary judgment record, we think it appropriate to make a few additional observations about public officials and employees' right to appellate review of evidentiary sufficiency questions underlying their qualified immunity defenses. The Supreme Court's *Johnson* decision applies only to interlocutory review, not to appellate review following final judgment. As we have stated previously:

> a defendant who does not win summary judgment on qualified immunity grounds may yet prevail on those grounds at or after trial on a motion for a judgment as a matter of law. *See Adams v. St. Lucie County Sheriff's Dep't,* 962 F.2d 1563, 1579 n. 8 (11th Cir.1992) (Edmondson, J., dissenting) (dictum); *id.,* at 1567 n. 2 (non-majority opinion of Hatchett, J.) (dictum), *rev'd per curiam on other grounds,* 998 F.2d 923, 923 (11th Cir.1993) (en banc). Moreover, a district court can, "when needed, ... use special verdicts or written interrogatories to the jury to resolve disputed facts before the judge rules on the qualified-immunity question." *Id.;*

---

[3]In determining the facts for summary judgment purposes, we, like the district court, are required to view the evidence in the light most favorable to the plaintiff. When that is done, a pure issue of law is created.

> *accord Stone v. Peacock,* 968 F.2d 1163, 1166 (11th Cir.1992)
> (per curiam) (dictum).  What we decide in this interlocutory
> appeal is only whether the district court should have granted
> *summary judgment* on qualified immunity grounds.

*Kelly,* 21 F.3d at 1546-47 (footnote omitted);  *accord Bendiburg v.*

*Dempsey,* 19 F.3d 557, 561 (11th Cir.1994).

In cases where defendants are entitled to qualified immunity,
it is imperative that they receive the benefits of that defense
prior to trial through Fed.R.Civ.P. 12(b)(6), Fed.R.Civ.P. 12(c),
or Fed.R.Civ.P. 56(c).  That imperative results from the nature of
the entitlement to qualified immunity.  "The entitlement is an
*immunity from suit* rather than a mere defense to liability;  and
like an absolute immunity, it is effectively lost if a case is
erroneously permitted to go to trial."  *Mitchell v. Forsyth,* 472
U.S. at 526, 105 S.Ct. at 2815;  *accord Behrens,* --- U.S. at ----,
116 S.Ct. at 839 ("*Harlow [v. Fitzgerald,* 457 U.S. 800, 102 S.Ct.
2727, 73 L.Ed.2d 396] [ (1982) ] and *Mitchell* make clear that the
defense is meant to give government officials a right, not merely
to avoid standing trial, but also to avoid the burdens of such
pretrial matters as discovery...." (internal quotation marks
omitted));  *Johnson,* --- U.S. at ----, 115 S.Ct. at 2158 (the very
policy militating in favor of immediate appeals from the denial of
qualified immunity motions is to protect public officials from
lawsuits);  *Anderson v. Creighton,* 483 U.S. 635, 646 n. 6, 107
S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523 (1987) (Because "[o]ne of the
purposes of the *Harlow* qualified immunity standard is to protect
public officials from the "broad-ranging discovery' that can be
"peculiarly disruptive of effective government'... we have
emphasized that qualified immunity questions should be resolved at

the earliest possible stage of a litigation."); *Ansley v. Heinrich,* 925 F.2d 1339, 1346-47 (11th Cir.1991).[4]

Where the defendant's pretrial motions are denied because there are genuine issues of fact that are determinative of the qualified immunity issue, special jury interrogatories may be used to resolve those factual issues. *See Stone v. Peacock,* 968 F.2d 1163, 1166 (11th Cir.1992); *Bendiburg v. Dempsey,* 19 F.3d at 561. Because a public official who is put to trial is entitled to have the true facts underlying his qualified immunity defense decided, a timely request for jury interrogatories directed toward such factual issues should be granted. Denial of such a request would be error, because it would deprive the defendant who is forced to trial of his right to have the factual issues underlying his defense decided by the jury.

We do not mean to imply, of course, that district courts should submit the issue of whether a defendant is entitled to qualified immunity to the jury. Qualified immunity is a legal issue to be decided by the court, and the jury interrogatories should not even mention the term. *Bendiburg v. Dempsey,* 19 F.3d at 561; *Stone v. Peacock,* 968 F.2d at 1165-66; *Ansley v. Heinrich,* 925 F.2d at 1348. Instead, the jury interrogatories should be restricted to the who-what-when-where-why type of historical fact issues.

---

[4]Not only is a defendant entitled to interlocutorily appeal the denial of his qualified immunity defense when he asserts it in a Rule 12(b)(6) motion, or in a Rule 56 motion for summary judgment, he is entitled to interlocutorily appeal denial of both such motions even where it results in two pretrial appeal proceedings in a single lawsuit. *Behrens,* --- U.S. at ----, 116 S.Ct. at 839.

When a district court has denied the qualified immunity defense prior to trial based upon its determination that the defense turns upon a genuine issue of material fact, the court should revisit that factual issue when, and if, the defendant files a timely Fed.R.Civ.P. 50(a) or (b) motion. The party who receives an adverse ruling on such a motion is free to seek appellate review of that ruling in the usual manner following final judgment. The effect of *Johnson v. Jones* on the power of appellate courts to review pure evidentiary sufficiency rulings relating to qualified immunity is confined to interlocutory appeals.

## III. THE FACTS IN THIS CASE

In this part, we quote from the district court's memorandum opinion and order denying defendant's motion for summary judgment, those facts which it found from the summary judgment record and relied upon to deny the summary judgment on qualified immunity grounds, as well as on the merits.[5]

"On December 27, 1990, Caldwell and Wilson were dispatched to 2721 Second Street in Montgomery, Alabama to respond to a call on the 911 emergency phone number. Upon arriving at that address, they were met by Ella Ree Cottrell, who advised them that the decedent, her grandson, had a history of psychological problems; that he had stopped taking his medication which suppressed those problems; and that he needed to be taken to a hospital. After an incident occurred inside the residence, the officers placed the decedent under arrest. A struggle then ensued and Caldwell and

---

[5]We directly quote the full substantive text of these factfindings, but omit the district court's record citations.

Wilson called for assistance."

"Shortly thereafter, Kemplin, Henderson and other police officers arrived. After a struggle of twenty minutes, the decedent was subdued and placed in handcuffs and leg restraints. The defendants then placed the decedent in a police car with his feet on the rear seat and his head in the space between the front and rear seats. In this position, the decedent was unable to adequately inhale oxygen and because of the handcuffs and leg restraints could not reposition himself."

"Thereafter, Caldwell drove the police car back to the police station and Wilson sat in the rear seat with the decedent. During this period, the decedent died of "positional asphyxiation.' "

After stating the facts quoted above, the district court discussed some legal rules and principles of law, and then stated as follows:

"In the instant case, Cottrell presents two pieces of evidence from which the court concludes that a genuine issue of material fact exists as to whether or not the individual officers acted with either gross negligence or deliberate indifference."

"First, Cottrell offers the affidavit of James J. Fyfe ("Fyfe'), an expert in police practices and procedures. Fyfe maintains that: (1) "it was well known by police on the day of Mr. Wilson's death improper restraint of arrested persons, particularly those on medication and/or who have engaged in strenuous activity, could quickly cause death by asphyxiation'; (2) "police administrators throughout the United States have formulated clear policies and training designed to assure that officers transport

prisoners safely'; (3) "[g]enerally accepted United States police custom and practice dictates that arrested persons whose hands and legs have been restrained be transported in police patrol cars only if they can be seated in normal positions and secured to their seats by seat belts or lap restraints'; (4) "[i]f [an] arrested person whose hands and legs have been restrained are too violent or active to be transported while normally seated in police patrol cars, generally accepted United States police custom and practice dictates that they be transported in ambulances or specially designed vehicles'; (5) "[g]enerally accepted United States police custom and practice also dictates that, no matter how they may be restrained, arresting officers constantly monitor the health and well-being of persons in their custody'; (6) police officers' training "should include recognition of signs that such persons are not breathing or suffocating, as well as appropriate response to such emergencies'; (7) the officers who arrested Mr. Wilson committed gross violations of the prevailing standards and caused his unnecessary death; (8) the affidavits of Caldwell, Henderson, Kemplin, Wilson, and Deputy Chief Mallory indicate that the officers have not received proper training."

"Next, Cottrell offers copies of the transcripts and reports of the Alabama Bureau of Investigation's ("ABI') interviews of Caldwell, Henderson and Ms. Daisy Presley ("Presley').[4]"

"During her interview, Caldwell recalled statements by the decedent's grandmother, at the time she arrived on the scene, that indicated to her and Wilson that the decedent had a mental problem and was taking medication. Her interview reveals that a

twenty-five minute struggle occurred between the officers and the decedent and that it took six officers to handcuff him. Caldwell also stated that during the struggle the decedent struck her and Wilson and that Wilson struck the decedent. With regards to transporting the decedent, she stated that she drove the vehicle and Wilson sat in the back with the decedent; the decedent was in handcuffs and leg restraints, lying face down on the floorboard; and that Wilson and the decedent did not communicate between the time they placed the decedent in the vehicle and the time that they realized there was a problem.[5]"

"During his interview, Henderson emphasized that the decedent was "really strong' and "three grown men couldn't hold this man down.' He stated that during the struggle the decedent was "breathing pretty hard.' Henderson also recalled that he kept asking out loud "what [the decedent] was on or what's wrong with him.' [6] He noted that "I can't stress enough that through my mind the whole time struggling with him and wrestling with a person you can get tired real quick and I know we had been out there with him at least 10 [minutes].' [7]"

"[4] Presley is a neighbor of the decedent and his grandmother."

"[5] The drive from the decedent's home to the police station lasted approximately five minutes."

"[6] With regards to his questioning the decedent's condition, Henderson further recalled that "I was pushing his leg real hard and it didn't phase him one bit, it's like nobody's doing a thing to him.... They drug him out of the house cause he wouldn't stand up and he just had a weird look on his face, I mean he just wouldn't respond to nothing like a normal person would.' "

"[7] Henderson previously stated that the other officers were with the decedent for at least twenty minutes before he

arrived."

"Finally, the ABI report of Presley's interview indicates that she stated that: (1) she observed police officers drag the decedent out of his home; (2) he appeared "limp', and (3) when officers placed him on the pavement his face went down on the pavement and he did not attempt to move his face."

## IV. ANALYSIS

A. The Mistreatment in Custody Claim

We think that in view of the circumstances of this case, the proper analytical approach to reviewing the denial of summary judgment as to the custodial mistreatment claim is the one the Supreme Court followed in *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), an interlocutory appeal decision which held that the district court's denial of the defendant's motion for summary judgment on qualified immunity grounds was due to be reversed. The Supreme Court reached that conclusion by going straight to the merits and holding that the plaintiff "not only failed to allege the violation of a constitutional right that was clearly established at the time of Gilley's actions, but he failed to establish the violation of any constitutional right at all." 500 U.S. at 233, 111 S.Ct. at 1794. Where the absence of merit in the plaintiff's case can be readily determined at the interlocutory appeal stage, the *Siegert* analytical approach makes sense, because "[a] necessary concomitant to the determination of whether the constitutional right is "clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of

a constitutional right at all." 500 U.S. at 232, 111 S.Ct. at 1793.

Although we have not considered the *Siegert* approach mandatory, *see Spivey v. Elliott,* 41 F.3d 1497, 1498 (11th Cir.1995), we have followed it on occasion, *see, e.g., Wooten v. Campbell,* 49 F.3d 696, 699 (11th Cir.), *cert. denied,* --- U.S. ----, 116 S.Ct. 379, 133 L.Ed.2d 302 (1995); *Burrell v. Board of Trustees of Ga. Military College,* 970 F.2d 785, 792 (11th Cir.1992), *cert. denied,* 507 U.S. 1018, 113 S.Ct. 1814, 123 L.Ed.2d 445 (1993). In *Burrell,* for example, we reversed a denial of summary judgment on qualified immunity grounds insofar as it involved an alleged conspiracy to violate the plaintiff's First Amendment right to freedom of speech. *Id.* at 792-93. Our reasoning was that:

> Assuming, without deciding, that Baugh and Goldstein would have violated a clearly established constitutional right by conspiring with Baggarly to have Burrell fired for speaking out against GMC, the record does not contain inferable facts that could support a finding that either Baugh or Goldstein in any way conspired with Baggarly to discharge her for her public criticism of GMC. Without a conspiracy, there obviously is no constitutional violation. Without a constitutional violation, there can be no violation of a clearly established constitutional right. *See Oladeinde v. City of Birmingham,* 963 F.2d 1481, 1485 (11th Cir.1992) (citing *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991)).

We will follow the *Siegert* approach here, just as we did in *Burrell,* but instead of examining the record ourselves as we did in *Burrell,* we will begin with the facts found by the district court and supplement them only where necessary to determine if summary judgment should have been granted after proper application of the law to the facts.

Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners. *E.g., Bell v. Wolfish,* 441 U.S. 520, 535 & n. 16, 99 S.Ct. 1861, 1872 & n. 16, 60 L.Ed.2d 447 (1979); *Hale v. Tallapoosa County,* 50 F.3d 1579, 1582 n. 4 (11th Cir.1995); *Jordan v. Doe,* 38 F.3d 1559, 1564-65 (11th Cir.1994). However, the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees. *E.g., Jordan,* 38 F.3d at 1564-65 (citing *Hamm v. DeKalb County,* 774 F.2d 1567, 1574 (11th Cir.1985), *cert. denied,* 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986)).

Finding no evidence that the defendant officers intended that Leroy Wilson, the arrestee, be asphyxiated, the district court read the due process claim as one alleging deliberate indifference and proceeded to analyze it on that basis. Actually, the district court applied to the evidence a standard of " *either* gross negligence *or* deliberate indifference" (emphasis added), a standard it drew from language in *Owens v. City of Atlanta,* 780 F.2d 1564, 1567 (11th Cir.1986). The "gross negligence" language in the *Owens* opinion is dictum, because the evidence in that case showed at most simple negligence, which would have been insufficient to state a valid due process claim regardless of whether the standard was deliberate indifference, or was either gross negligence or deliberate indifference. In any event, the Supreme Court's recent decision in *Farmer v. Brennan,* --- U.S. ----, 114 S.Ct. 1970, 128

L.Ed.2d 811 (1994), which was released after this case left the district court, makes it clear that "gross negligence" is not part of the standard for judging custody mistreatment claims under the Due Process Clause.

In *Farmer,* the Court began with the proposition that the mistreatment standard is " "deliberate indifference' to a substantial risk of serious harm," *id.* at ----, 114 S.Ct. at 1974, and then proceeded to define the standard which has both an objective component and a subjective component. *Id.* at ----, 114 S.Ct. at 1977. To satisfy the objective component, the plaintiff must show a deprivation that is, "objectively, sufficiently serious," which means that the defendants' actions resulted "in the denial of the minimal civilized measure of life's necessities." *Id.* (internal quotation marks omitted).

Even when that objective component is established, an in custody mistreatment claim still fails unless the plaintiff establishes that the defendant had a " "sufficiently culpable state of mind.' " *Id.* That requisite "state of mind is one of deliberate indifference to inmate health or safety." *Id.* (internal quotation marks omitted). It is a state of mind "lying somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Id.* at ----, 114 S.Ct. at 1978. It is "the equivalent of recklessly disregarding" a substantial risk of serious harm to the inmate. *Id.* The Court in *Farmer* squarely rejected the plaintiff's invitation to adopt a purely objective test for deliberate indifference, holding instead that there could be no liability "unless the official knows of and disregards an

excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at ----, 114 S.Ct. at 1979. There is no liability for "an official's failure to alleviate a significant risk that he should have perceived but did not...." *Id.*

Applying *Farmer* to the facts found by the district court in this case, it is apparent that summary judgment should have been granted on the in custody mistreatment claim. The district court did not find that either defendant knew of and disregarded an excessive risk that Leroy Wilson would suffocate after he was placed in the back seat of the police car and before it arrived at the station five minutes later; the court did not find that either defendant drew from the facts known to that defendant the inference that a substantial risk of harm existed.

Because *Farmer* was released after the district court issued its order and findings, we have examined the record carefully to determine if there is any genuine issue of material fact as to the subjective intent element prescribed in *Farmer. Cf. Johnson,* --- U.S. at ----, 115 S.Ct. at 2159 (where a district court has not stated the facts upon which its decision to deny summary judgment is based, a court of appeals may have to review the record to determine what facts the district court likely assumed). The record contains no evidence that either defendant officer knew of and consciously disregarded the risk that Charles Wilson would suffocate in the back seat of the police car. As the district court's findings indicate, there is evidence, in the form of an

affidavit from plaintiff's expert, that most police officers around the country receive training designed to assure safe transportation of prisoners, and that such training should include recognition of signs of suffocation. However, the district court found that the officer defendants in this case had *not* received such training ("the affidavits ... indicate that the officers have not received proper training.").

The affidavit of plaintiff's expert also states, in conclusory terms, that "it was well known by police on the day of Mr. Wilson's death improper restraint of arrested persons, particularly those on medication and/or who have engaged in strenuous activity, could quickly cause death by asphyxiation." Such a conclusory statement about police in general is not evidence about the mental state of these defendant officers in particular. The same is true of the statements in the expert's affidavit that these officers' conduct violated "[g]enerally accepted United States police custom and practice" in several ways. *Farmer* requires a great deal more of the plaintiff than a showing that the defendants violated generally accepted customs and practices.

Because there is no evidence in the summary judgment record sufficient to support a jury finding that the defendant officers were consciously aware of and disregarded the risk that Mr. Wilson would suffocate, plaintiff has failed to show a violation of due process, and it necessarily follows that the defendants are entitled to summary judgment on qualified immunity grounds. *See Siegert,* 500 U.S. at 232, 111 S.Ct. at 1793. We are confident that the district court would have reached that conclusion, and ruled

differently than it did, if the *Farmer* decision had been available to it.

B. The Excessive Force Claim

The district court disposed of the defendants' motion for summary judgment on the Fourth Amendment excessive force claim in a footnote, simply stating that because of its decision to deny summary judgment as to the Due Process claim, "prudence dictates that it also denied defendants' motion for summary judgment on [plaintiff's] Fourth Amendment claim. Defendants are given leave to raise this issue again at the time of trial." When their motion for summary judgment on qualified immunity grounds is denied, defendants are not required to have leave of court in order to raise the defense again at trial. *See supra* pp. 10-13. To the extent that the district court's language could be interpreted as declining to rule on the qualified immunity issue until trial, its action had the same effect, for our interlocutory jurisdiction purposes, as a complete denial. *See, e.g., Collins v. School Bd. of Dade County, Fla.,* 981 F.2d 1203, 1205 (11th Cir.1993). To the extent that the district court's reasoning is based, as its language seemingly indicates, upon its decision to deny the motion for summary judgment as to the due process claim, then it is erroneous because the court's reasoning on the due process claim is itself erroneous, for the reasons we have previously discussed.

In any event, the two claims involve different legal standards. The proper standard for judging Fourth Amendment excessive force claims is set out in *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). That standard is one

of objective reasonableness: "the question is whether the officers' actions are "objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." 490 U.S. at 397, 109 S.Ct. at 1872. The district court's detailed factfindings concerning the events surrounding the arrest and the force applied make it clear that there is no genuine issue of material fact concerning excessive force in this case, and the defendant officers are entitled to summary judgment as a matter of law. It necessarily follows that the district court should have granted their motion for summary judgment on qualified immunity grounds. *See Siegert,* 500 U.S. at 232, 111 S.Ct. at 1793.

## V. CONCLUSION

We REVERSE the district court's denial of the defendants' motion for summary judgment on qualified immunity grounds as to both claims and REMAND this case for further proceedings consistent with this opinion.