[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-11828

Non-Argument Calendar

_____

MICHELIN D. MCKEE,
as Personal Representative of the Estate
of SALAYTHIS MELVIN the Deceased,

                                                    Plaintiff-Appellee,

*versus*

JAMES MONTIEL,

                                                    Defendant-Appellant,

DEPUTY MARCUS BULLOCK,
in his individual capacity and as an agent
of ORANGE COUNTY SHERIFFS OFFICE, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:21-cv-01085-CEM-EJK

_____

Before JORDAN, BRANCH, and LUCK, Circuit Judges.

PER CURIAM:

Defendant James Montiel appeals the district court's denial of his motion for summary judgment based on qualified and sovereign immunity. After careful review, we conclude that we lack jurisdiction over Montiel's appeal because his arguments turn on the facts, not the law. Accordingly, we dismiss this appeal.

## I. Background

### A. Factual Background

Defendant James Montiel is a former deputy with the Orange County Sheriff's Office ("OCSO") in Orange County, Florida. One day in August 2020, Montiel and other OCSO officers were surveilling a man named Vanshawn Sands, who had an outstanding warrant for possession of a firearm by a felon. At some point while under surveillance, Sands entered a vehicle, which eventually drove to a Dick's Sporting Goods store at a mall. Once at the store, Sands exited the vehicle along with three others—

Christopher Bennett, Janai Jones, and Salaythis Melvin. The surveilling officers eventually identified Bennett as having an outstanding warrant for tampering with an electronic monitoring device. Jones and Melvin, though, remained unidentified.

All four individuals entered the Dick's Sporting Goods store, where an undercover OCSO officer continued to observe them. The undercover officer followed Sands throughout the store and relayed his location and activities to the other officers on the scene. Eventually, Sands and Jones decided to leave, followed by Bennett and Melvin. On their departure, the officers waiting outside the store, including Montiel, decided to "apprehend the subjects before they could get back to the[ir] vehicle."

Officers confronted the four individuals as soon as they exited the store. Sands, Bennett, and Jones were quickly apprehended. Melvin, however, chose to flee on foot into the parking lot.

Responding to the attempt to apprehend the four individuals, Defendant Montiel rounded the corner of the Dick's Sporting Goods store in his unmarked police vehicle. When he turned the corner, he saw "a black male"—Melvin—"running towards [his] direction." Montiel slammed on the brakes and got out of the vehicle. Melvin ran away from Montiel. As Melvin ran away, Montiel shot Melvin in the lower back. After the shooting, a handgun and holster were found separated within several yards of Melvin. Melvin later died from the gunshot.

The details of the shooting are disputed.  Montiel claims that when he first saw Melvin running in his direction, Melvin's "waistband was exposed," and Melvin was "clutching a tan firearm in his waistband."  And when Montiel got out of the car to confront Melvin, Montiel allegedly gave Melvin commands to stop running and drop his gun.  Montiel also claims that while Melvin was running away, Melvin "slowed down" and "looked over his shoulder" to "tak[e] a sight picture" of Montiel so that he could "get a good shot."  According to Montiel, he shot Melvin because he feared that Melvin was going to shoot him.

Other evidence sheds further light on the shooting.  No officer other than Montiel claimed to see a gun on Melvin's person.  A DNA analysis excluded Melvin as a contributor to DNA found on the gun, while including him as a possible contributor to DNA found on the holster.  Deputy Corey Heller testified that he saw Melvin running with "one of his hands up on his waistline, towards the front of his pants" and the other hand "pumping" in "an up and backwards motion."[1]

Heller also testified that he saw Melvin "turn his head back to look at" Montiel "more than once," consistent with Montiel's claim that Melvin was taking a "sight picture" of him.  But body camera footage from the incident neither confirms nor denies that

---

[1] In his deposition, Heller clarified that he was a "couple hundred yards" away from Melvin at the time Melvin was shot.  He also explained that at the time of the shooting, he was inside his car, and his view was sporadically blocked by parked and moving vehicles in the parking lot.

Melvin indeed slowed down and turned around to look at Montiel. Further, and finally, no officer heard Montiel give any commands to Melvin to stop or drop his gun.[2]

### B.    Procedural History

Michelin D. McKee, as the personal representative of Melvin's estate, sued Montiel in his individual capacity in June 2021. As relevant here, McKee's amended complaint asserted a 42 U.S.C. § 1983 claim for excessive force in violation of the Fourth Amendment and a Florida state-law battery claim against Montiel.[3]

After discovery, Montiel moved for summary judgment on both claims. He argued that shooting Melvin was reasonable under the circumstances because Melvin had a gun and, while running away, was preparing to shoot him. That is, Montiel asserted that he reasonably feared for his own life. Thus, he argued that he was entitled to qualified and sovereign immunity on McKee's claims.

McKee responded by attempting to dispute Montiel's version of events. Relying heavily on the body camera footage

---

[2] Also disputed is whether Montiel's clothing on the day of the shooting revealed that he was a law enforcement officer.

[3] McKee also asserted, against Montiel, a § 1983 claim for failure to render aid in violation of the Fourteenth Amendment. The district court granted summary judgment for Montiel on that claim. Further, McKee asserted claims against other deputies and the Orange County Sheriff, but the district court dismissed those claims in various orders. Thus, the only claims at issue here are the excessive force and state-law battery claims against Montiel.

from the incident, McKee argued that there was a genuine dispute of material fact as to whether Melvin slowed down to look at Montiel while he was running away. She also argued that there was a genuine dispute as to whether Melvin ever drew the gun from its holster. According to McKee, a reasonable jury could conclude that Montiel did not reasonably fear that Melvin was going to harm him and that, therefore, a trial was warranted.

The district court sided with McKee and denied Montiel's motion for summary judgment. The court began by noting that if "Montiel's version of events is credited, then . . . Montiel reasonably used deadly force." That said, the court ended up holding that "there [was] enough conflicting evidence to allow a reasonable juror to reach alternate conclusions" as to the facts. The court therefore denied summary judgment.

The district court explained why it found that each key fact was up for dispute. First, the district court found that, generally, "the circumstances surrounding Deputy Montiel's statement implicate[d] his credibility." Montiel did not give a contemporaneous statement, even though all the other officers did. And when he finally gave a statement, it was 11 days after the shooting and after he had reviewed body camera footage and spoken with his attorney. These facts, the district court held, made it such that a jury could find that Montiel's statement was unreliable.

Second, the district court discounted Deputy Corey Heller's testimony that he saw Melvin with his hand on his waistband and

turning to look at Montiel while running in the parking lot. According to the district court, Heller's testimony "suffer[ed] from . . . inconsistencies and questions of credibility" because Heller made the above assertions only in his deposition testimony, and not also in his contemporaneous statement or sworn interview. Also, as Heller admitted, he was a couple hundred yards away from Montiel and Melvin at the time of the shooting, and at times there were vehicles blocking his view from inside his own car.

With the testimony and statements of both Montiel and Heller called into question, the district court then analyzed each of Montiel's factual claims. As to Montiel's assertion that he saw Melvin with a gun in his waistband, the district court held that "[a] reasonable juror could conclude that Deputy Montiel did not see the gun." The district court explained that Montiel's initial encounter with Melvin "happened in a matter of seconds," all while Montiel "was in his vehicle, slamming on the brakes, putting the vehicle in park, and getting out of the vehicle." In addition, "no other law enforcement officer"—including the officer observing Melvin inside the Dick's Sporting Goods store—"saw the gun in Melvin's waistband." Given these circumstances, the court concluded that despite Montiel's testimony that he saw the gun, there was a genuine dispute of material fact on that issue.

Next, as to Montiel's assertion that Melvin slowed down and turned back to look at him while running away, the district court held that Montiel's assertion was "flatly refuted by the body camera

footage showing Melvin in a full sprint away." The court explained that "particularly given how fast [Melvin] was running," "a reasonable jury could conclude that Melvin never turned his head and shoulders to look back."

The rest of Montiel's key factual assertions suffered the same fate. Given discrepancies in testimony and the fact that Melvin's DNA was not found on the gun, the district court found that there was a genuine dispute over whether Montiel saw Melvin with his hand on the gun. The district court also found a genuine dispute over whether Montiel identified himself as law enforcement and gave Melvin commands to drop his gun. And finally, as to Montiel's argument that the "final resting places of the gun and holster" necessarily showed that "Melvin had removed the gun from its holster" before being shot, the court found that discrepancies and omissions in testimony created a genuine dispute on that point as well.

The district court summed up its fact-related findings as follows, holding that a reasonable jury could conclude that

> [t]here was no indication that Melvin was committing or ever had committed any crime, violent or otherwise. He was merely in the company of someone who had previously committed a crime. There was also no indication that Melvin was armed. When initially confronted by law enforcement, Melvin ran across the parking lot, and when he saw Deputy Montiel, he pivoted and sprinted full speed away. To stop his flight, Deputy Montiel utilized

deadly force and shot Melvin in the back despite having no information that Melvin was armed or a threat to anyone and without providing a warning.

The district court reasoned that "[u]nder this version of events, a jury could find that Deputy Montiel's use of deadly force was unreasonable and therefore violated Melvin's constitutional rights." Such a violation would also violate clearly established law, as required to overcome qualified immunity. And the court held that the same conclusion about the reasonableness of the force applied for the Florida state-law battery claim. The district court therefore denied Montiel's motion for summary judgment.

Montiel timely appealed.

## II.     Standard of Review

We review *de novo* an officer's entitlement to summary judgment based on immunity. *English v. City of Gainesville*, 75 F.4th 1151, 1155 (11th Cir. 2023). We also review *de novo* jurisdictional questions. *Id.*

## III.     Discussion

On appeal, Montiel argues that the district court erred in denying his motion for summary judgment. Broadly speaking, he argues that shooting Melvin was reasonable under the circumstances because Melvin was armed and preparing to shoot him. Thus, Montiel claims, he is entitled to qualified and sovereign immunity. McKee responds by defending the district court's judgment on the merits. She also asserts that given that Montiel's appeal really boils down to a dispute about the facts and not the law, we do not have jurisdiction over the appeal.

We agree with McKee that we lack jurisdiction to review the district court's order denying summary judgment in this case. We first address the district court's denial of federal qualified immunity. We then address the denial of state sovereign immunity.

> A.    *We lack jurisdiction to review the district court's denial of qualified immunity*

Under 28 U.S.C. § 1291, courts of appeals have jurisdiction to review "final decisions of the district courts." 28 U.S.C. § 1291. "Generally, a final decision is one that terminates the litigation." *Howell v. Schweiker*, 699 F.2d 524, 528 (11th Cir. 1983). That said, the Supreme Court has held that even an order that does not end the litigation is "final" if it fits in "that small class [of orders] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). One such potential "collateral" order is an order denying qualified immunity. *See Mitchell v. Forsyth*, 427 U.S. 511, 527–30 (1985).

"Whether we have interlocutory jurisdiction to review the denial of summary judgment on qualified immunity grounds depends on the type of issues involved in the appeal." *English*, 75 F.4th at 1155 (quoting *Cottrell v. Caldwell*, 85 F.3d 1480, 1484 (11th Cir. 1996)). We have jurisdiction "over legal issues that are the basis for a denial of summary judgment on qualified immunity

grounds." *Id.* (quotation omitted). But we lack jurisdiction "where the only issues appealed are evidentiary sufficiency issues." *Id.* (quotation omitted).

Determining whether an official is entitled to qualified immunity "involves a two-part analysis: (1) defining the official's conduct, based on the record and viewed most favorably to the non-moving party, and (2) determining whether a reasonable public official could have believed that the questioned conduct was lawful under clearly established law." *Id.* (quoting *Koch v. Rugg*, 221 F.3d 1283, 1295 (11th Cir. 2000)). Where a defendant's appeal of a denial of summary judgment turns only on the first issue—*i.e.*, the factual issue of "defining the official's conduct"—we lack jurisdiction over the appeal. *See id.* at 1155–56 (explaining that we lacked jurisdiction over an appeal where the district court ruled against the defendants "because of a genuine dispute of material fact" as to whether the officers actually saw the plaintiff "make a quick motion as if to reach for a gun"); *Hall v. Flournoy*, 975 F.3d 1269, 1277 (11th Cir. 2020) (holding that we lack jurisdiction over a denial of summary judgment based on qualified immunity where "all we are left with is the factual review of what happened"); *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996) (explaining that we do not have jurisdiction to review a denial of summary judgment "if what is at issue . . . is nothing more than whether the evidence could support a finding that particular conduct occurred"). On the other hand, where the appeal of the denial of summary judgment turns on the second issue—*i.e.*, the legal question of "whether any constitutional right was violated or whether the violation of that

right was clearly established"—we have jurisdiction to review the district court's order. *Hall*, 975 F.3d at 1276; *see also English*, 75 F.4th at 1155.

Here, based on the parties' arguments, the only dispute at issue is what happened on the day of the shooting. We therefore lack jurisdiction over this appeal. *English*, 75 F.4th at 1155. Montiel argues that shooting Melvin was reasonable under the circumstances because he saw Melvin with his hand on a gun, Melvin slowed down and turned around to look at Montiel in apparent preparation to fire his weapon, Melvin was known to be with dangerous individuals, and the final resting places of Melvin's gun and holster show that Melvin did indeed draw his gun while running away from Montiel.

The district court, however, found that each of these facts was subject to genuine dispute. The court held that "a reasonable juror could conclude" that "[t]here was no indication" that Melvin himself was dangerous, armed, "or a threat to anyone." In other words, there was a genuine dispute of fact as to whether Montiel saw Melvin with a gun and saw Melvin turning around to shoot Montiel. The court also held that there was a genuine dispute of fact as to whether Melvin ever drew his gun. To be sure, the district court recognized that if "Montiel's version of events is credited, then . . . Montiel reasonably used deadly force." But the court ended up finding that a reasonable jury could choose not to credit Montiel's story. And it was precisely because the court made that finding that summary judgment was denied. At bottom, "the

district court ruled against [Montiel] because of a genuine dispute of material fact. This is the type of ruling that we lack jurisdiction to review." *Id.* at 1156.

The same conclusion applies to Montiel's argument that, "[a]ssuming[] without conceding that" he violated Melvin's right to be free from excessive force, that right was not clearly established under these circumstances. *See Hall*, 975 F.3d at 1275 (explaining that to defeat qualified immunity, the plaintiff must establish that the defendant violated a "clearly established" constitutional right). Montiel claims that he did not violate clearly established law because "officers, when threatened by an armed suspect . . . act[] reasonably in firing at the suspect." In other words, his argument depends on a finding that Melvin in fact posed a threat. However, again, the district court ruled against Montiel on the facts, explaining that "whether . . . Montiel violated clearly established law turns on the previously discussed issues of fact"— *i.e.*, whether Melvin indeed posed a threat to Montiel. We lack jurisdiction to review this fact-based ruling.

At bottom, "the dispute [in this case] is about what the evidence could prove at trial; it is not a dispute about principles of law." *English*, 75 F.4th at 1156. Montiel does not argue that he would be entitled to qualified immunity if, as the district court determined a reasonable jury could find, Melvin indeed posed no danger to him or others. Rather, Montiel argues that he is entitled to qualified immunity because the facts show that Melvin *did indeed* pose a danger. But the district court found that a reasonable jury

14                  Opinion of the Court                  24-11828

could disagree.  We therefore lack jurisdiction over the district court's denial of summary judgment based on qualified immunity.[4]

> B.      *We lack jurisdiction to review the district court's denial of state sovereign immunity*

"[A]n order denying summary judgment based on state sovereign immunity is immediately appealable 'if state law defines the immunity at issue to provide immunity from suit rather than just a defense to liability.'"  *Coleman v. Hillsborough Cnty.*, 41 F.4th 1319, 1324 (11th Cir. 2022) (quoting *Parker v. Am. Traffic Sols., Inc.*, 835 F.3d 1363, 1367 (11th Cir. 2016)).  "In Florida, sovereign immunity is both an immunity from liability and an immunity from suit."  *Id.* (quoting *Fla. Hwy. Patrol v. Jackson*, 288 So. 3d 1179, 1185 (Fla. 2020)).  So ordinarily, we would have jurisdiction to review the district court's denial of state sovereign immunity.  "But as in the qualified immunity context, we lack interlocutory appellate jurisdiction over the denial of summary judgment based on state-law immunity where the appeal turns on issues of evidentiary sufficiency."  *English*, 75 F.4th at 1157.

---

[4] To the extent Montiel argues that he raised a legal issue on appeal by asserting, in one sentence of his initial brief, that "the District Court failed to analyze the alleged constitutional violation under the 'arguable probable cause' standard," that argument fails.  For "[w]e have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."  *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).

24-11828                Opinion of the Court                15

Such is the case here. "Pursuant to Florida law, police officers are entitled to a presumption of good faith in regard to the use of force applied during a lawful arrest, and officers are only liable for damage where the force used is 'clearly excessive.'" *Davis v. Williams*, 451 F.3d 759, 768 (11th Cir. 2006) (quoting *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996)). Further, an officer "may not be held personally liable in tort" for actions taken in the scope of his employment "unless such officer . . . acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a).

Montiel argues on appeal that he is entitled to state sovereign immunity because "he had confronted an armed suspect [that] he believed was ready to take a shot at him." But the district court denied summary judgment on the battery claim because it found that "there is a triable issue of fact as to whether excessive force was used." (quotation omitted). That is, the court found that "[t]aking [McKee's] version of the facts as true, [Montiel] did not act in response to any actual or threatened deadly force." (quotation omitted). Montiel's arguments thus turn on the facts, not the law. We therefore lack jurisdiction over this appeal.[5]

---

[5] Montiel asserts in his reply brief that the district court "only addresse[d] part of the immunity analysis" under Florida law and thus "committed an error of law." Showing up for the first time in the reply brief, that argument "come[s] too late." *See Sapuppo*, 739 F.3d at 683 (holding that arguments made for the first time in a reply brief "come too late").

## IV.    Conclusion

At bottom, Montiel's appeal turns on "the factual inferences the district court drew from a series of circumstances." *Hall*, 975 F.3d at 1278.  We therefore lack jurisdiction to review the district court's order.  To be sure, "[w]e may disagree with the inferences the district court has drawn, and they are far from airtight. However, to review that determination now would amount to nothing more than weighing the evidence supporting the district court's summary judgment determination." *Id.*  Such weighing of the evidence "is precisely what the Supreme Court has said we cannot do at this interlocutory stage." *Id.*  For these reasons, Montiel's appeal is dismissed.

**DISMISSED.**