Paul GUSEMAN, by his next friend and legal guardian, Evelyn GUSEMAN; Ernest Moulos, Administrator of the Estate of Penny S. Guseman, Deceased, Plaintiffs,

v.

Orlando MARTINEZ, Robert Shea, Brian C. Falco, Eric S. Tims, David Gorges, Dennis A. Wilson, and the City of Wichita, Kansas, a Municipal Corporation, Defendants.

No. 96–1074.

United States District Court,
D. Kansas.

Feb. 17, 1998.

Garry L. Howard, Dale V. Slape, Slape & Howard, Chartered, Wichita, KS, Michael B. Brewer, Wichita, KS, for Plaintiffs.

Blaise R. Plummer, Law Dept., Wichita, KS, Edward L. Keeley, McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, KS, H.E. Jones, Wichita, KS, for Defendants.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

This suit arises out of the death of Penny Guseman. Ms. Guseman was taken into custody by Wichita Police officers following a disturbance and was shackled and handcuffed with her hands behind her back in a prone position. She died shortly thereafter from what the coroner determined was "positional asphyxiation." Plaintiffs subsequently brought this action alleging that the defendants, acting under color of state law, deprived Ms. Guseman of her rights under the Fourth, Eighth and Fourteenth Amendments to the U.S. Constitution and are liable for damages under 42 U.S.C. § 1983. Plaintiffs also assert claims for damages under Kansas tort law. The matter is now before the court on the parties' cross-motions for summary judgment. The court finds that oral argument would not assist in deciding the issues presented.

The standards and procedures for summary judgment are well established and will not be fully repeated here. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In essence, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

## I. *Uncontroverted Facts.*

At the outset the court must note that the parties have made it unusually difficult to set forth· the undisputed facts in any sort of concise and coherent manner. Although all of the claims and defenses arise from the same incident, there are eight separate motions and responses on summary judgment, each of which contains its own slightly different statement of uncontroverted facts. The various statements total some 75 pages. None of the parties has fully complied with D.Kan.R. 56.1. In setting forth a single statement of facts, the court has attempted to delete redundancies in the parties' statements as well as allegations that are clearly immaterial or that are not supported by the portions of the record cited in support thereof.

For purposes of summary judgment, the court finds no genuine dispute as to the following facts.

At all relevant times, defendants Robert Shea, Brian Falco, Orlando Martinez, and Eric Tims were certified law enforcement officers of the State of Kansas and commissioned police officers of the City of Wichita, Kansas.

The Kansas Law Enforcement Training Act (K.S.A. 74–5601, et seq.) requires that every full-time police officer or law enforcement officer in Kansas satisfactorily complete a course of not less than 320 hours of accredited instruction at the Kansas Law Enforcement Training Center ("KLETC")—which is located near Hutchinson—or at a certified state or local law enforcement training school. This training must be completed within one year of the officer's employment.

Prior to the incident in this case, the City of Wichita ("City") required each of its police recruits to successfully complete the recruit school at the Wichita–Sedgwick County Law Enforcement Training Center, a joint operation of the Wichita Police Department ("WPD") and the Sedgwick County Sheriff's Department. Pursuant to K.S.A.1995 Supp. 74–5604a, that school has been annually certified by the Director of the KLETC as satisfying the qualifications and standards of the Director, after approval of the Kansas Law Enforcement Training Commission.

The training period provided to police recruits at the Wichita–Sedgwick County Law Enforcement Training Center consisted of an intensive 20 weeks of law enforcement classes, followed by an 11–week program of field training. This training in excess of 800 hours far exceeded the 320 hours required by state law.

Among the subjects which police recruits were taught and tested upon at the academy were the following: WPD Rules and Regulations; WPD Policy and Procedures; U.S. Constitution and Bill of Rights; Kansas Criminal Code and Procedures; Use of Force (Legal Issues); Mechanics of Arrest; Community Policing; Occupant Protection; Laws of Arrest/Search and Seizure; Practical Problems in Criminal Investigation; CPR; Handcuffing and Search Techniques; Crowd Control (Pepper Mace); First Aid; Self Defense Techniques; Use of Force (Patrol Perspective); Domestic Violence; Tactical and Investigative Response; Practical Problems in Crisis Intervention; Conflict Resolution; Officer Survival; Civil and Criminal Liability; Death Investigations; Narcotics and Dangerous Drugs; Recognizing and Handling the Mentally Ill; Building Searches; Practical Problems in Officer Survival; Use of Deadly Force; Patrol Scenarios; Stress Management; Creating Satisfied Citizens; and Pressure Point Control Tactics.

Beginning in May 1992, Lt. Paul Dotson (now a Captain) was assigned to the Training Division of the Wichita Police Department. During that assignment, he became the coordinator of recruit training at the Wichita/Sedgwick County Law Enforcement Training Center. In that position, he coordinated all of the City's training of police recruits. He set the training schedule (in conjunction with a Sheriff's sergeant) and taught some of the classes.

During the second week of June 1994, Lt. Dotson was at the KLETC facility near Hutchinson with his recruit class when one of the KLETC instructors asked Dotson if he had heard about an article entitled "Pepper Spray and In Custody Deaths" from the

March 1994 edition of *Science and Technology*, a publication of the International Association of Chiefs of Police ("IACP"). Lt. Dotson had not heard of the article. The KLETC instructor gave him a copy.

The IACP article described a study which had been conducted to assess whether pepper spray (Oleoresin Capsicum or "OC") could be a factor in reports of in-custody death incidents where it had been used. The IACP article concluded:

Sudden death in custody is neither a new phenomenon nor attributable to the use of OC spray. Rather, sudden custody death can occur at any time for a variety of reasons. Any law enforcement agency may experience a sudden custody death, regardless of OC involvement. Consequently, officer awareness and recognition of risk indicators are necessary to ensure subject safety and minimize the risk of sudden custody death. These indicators generally include:

• bizarre violent activity

• obesity—especially "big bellies"

• drug and/or alcohol involvement

• apparent ineffectiveness of spray

Diligent observation and constant monitoring of subjects displaying any one or a combination of the indicators are procedurally warranted. Furthermore, the use of maximal, prone restraint techniques should be avoided. If prone positioning is required, subjects should be closely and continuously monitored. By implementing such procedural protocols, the potential for custody deaths may be lessened.

The KLETC instructor also gave Lt. Dotson a copy of a KLETC document apparently prepared on May 16, 1994, which is entitled "Oleoresin Capsicum and In–Custody Deaths." It summarizes the IACP article. The instructor told Dotson that the KLETC was going to begin teaching this information in its curriculum.

According to the IACP article, 30 instances were found between August of 1990 and December of 1993 in the United States where a detainee died in police custody following a spraying with OC. Out of the 22 incidents where sufficient information existed for a thorough review, positional asphyxia was identified as the cause of death in 18 incidents, with drugs and/or disease also being contributing factors.

When Lt. Dotson became aware of the IACP article in June of 1994, he felt that it was important information to ensure that the police knew how to recognize that a person may be prone to risk for sudden in-custody death, and he thought it should be put out right away to avoid a possible avoidable tragedy. He immediately incorporated the information into the recruit training program. He believed that anything that involved a potential death was relevant for the students to have.

Lt. Dotson went to his supervisor, Capt. Mark Richardson, who at that time was Chief of the Training Division of the Wichita Police Department. During a face-to-face meeting, Lt. Dotson presented the information on positional asphyxia to Captain Richardson. Neither Dotson nor Richardson can recall whether Richardson was given any of the written materials which Dotson had received or prepared. Richardson was glad to receive the information because it was new to him as well. Dotson and Richardson had no additional conversation about this topic until after the incident at issue.

Under the policy of the Wichita Police Department in effect in June of 1994, it would not necessarily have been uncommon for a person placed in custody to be prone until the time came for the officers to get the individual up and into a patrol car. Captain Richardson perceived positional asphyxia as a life-threatening risk, and agreed with Lt. Dotson's assessment that Wichita police officers should be discouraged from leaving anyone in a prone position. To that point, in-service Wichita police officers had not been discouraged from this practice.

Within two weeks of receiving this information, Lt. Dotson incorporated it into the training for the City's police recruits. Lt. Dotson personally presented a class regarding in-custody deaths, including positional asphyxia, on June 22, 1994. He taught that if it was necessary to secure a person in a prone position, then after that is accom-

plished the person should be placed in a seated position or on the person's side. Lt. Dotson prepared an outline with written training objectives for his class presentation.

Two of the defendant police officers (Shea and Tims) involved in Ms. Guseman's arrest had been in the class on in-custody deaths taught by Lt. Dotson in June of 1994. The other defendant officers—Martinez, Falco, Gorges, and Wilson—had received their recruit training during prior years and had not received this instruction prior to Ms. Guseman's death on February 6, 1995.

Officer Shea attended the Wichita/Sedgwick County Law Enforcement Training Center beginning in April 1994. He studied the use of force and restraints and had the class at the training academy called "In-Custody Sudden Death." Shea was given information on positional asphyxia during this class, including contributing factors, risks, and techniques to minimize or avoid positional asphyxia.

Officer Tims graduated from the Wichita/Sedgwick County Law Enforcement Training Center on August 29, 1994. Tims also attended the class on In-Custody Sudden Death taught by Lt. Dotson.

Officer Falco attended the Wichita/Sedgwick County Law Enforcement Training Center and graduated on February 26, 1994. Falco did not receive any training in how to position a shackled arrestee or on the topic of in-custody death until after Penny Guseman's death.

Orlando Martinez attended the Fall 1978 recruit training class of the Wichita Police Department. He received a total of 640 hours of recruit training in law enforcement related curriculum. Martinez was commissioned as a Wichita police officer on December 22, 1978. Martinez completed in-service training requirements as mandated by the Kansas Law Enforcement Training Commission since the requirement became effective in 1983. He did not receive training on in-custody death until after Penny Guseman's death.

The 20-week recruit training program in which Officers Shea and Tims participated was completed in August 1994. The next 20-week recruit training program began in October 1994. Lt. Dotson taught the in-custody death class during that training session. He or someone else has continued to teach the in-custody death class in all subsequent recruit training sessions.

To maintain their certification, K.S.A.1995 Supp. 74–5607a requires all full-time police officers and law enforcement officers to annually complete 40 hours of in-service training in subjects relating to law enforcement. The Training Division of the Wichita Police Department offered in-service training for officers to complete their 40–hour requirement.

Twice a year, the Training Division of the Wichita Police Department conducted 8–hour mandatory in-service training sessions which the City required the officers to attend. These were held about every six months, once in the spring and once in the fall. The actual dates varied depending on the availability of instructors and other factors. These mandatory training sessions each lasted about a month in order to schedule and complete the training for the entire Department, which consisted of approximately 500 officers.

Some of the mandatory in-service training time was taken up by hazardous materials training required by state law and firearms training required by the Department. The other parts of the curriculum for each session was determined based on input from the rest of the Department about what areas were important or needed a refresher class.

As was previously indicated, in June of 1994 Lt. Dotson and Captain Richardson had some discussion about having the in-custody death instruction as part of a future mandatory in-service training session. The instruction was not given, however, during the only such session prior to Ms. Guseman's death. That training session was conducted in October of 1994. Captain Richardson does not recall why this training was not included in the October session. Nor does he recall whether he contacted his superiors about it or why it would not have been feasible to include the subject in the October 1994 in-service training session. He does not recall

discussing the subject with anyone else between June of 1994 and Ms. Guseman's death.

*Events on and after February 6, 1995.*

Wichita Police Officers Robert Shea and Brian Falco were riding together on patrol on the evening of February 6, 1995, when they were dispatched to investigate a 911 hang-up telephone call. A 911 hang-up call means that an individual or child picked up the telephone, called 911 and hung up the phone, and 911 then traced the call back to that residence. The call had originated from apartment 202 of an apartment complex at 2250 South Oliver in Wichita, Kansas.

Officer Shea had had several previous contacts with an individual named Richard Deveney, who lived in the 2200 block of South Oliver with a girlfriend. Mr. Deveney would get drunk and call 911 and would usually be fighting with his girlfriend.

Officer Falco had backed up a fellow officer earlier that same afternoon with regard to Deveney, when Deveney had been on a pay phone on South Oliver making either harassing calls or repeated 911 calls. Falco recalls that Deveney had been intoxicated.

Sometime after the initial dispatch, the police dispatcher made the following transmission to Unit 266 (Shea and Falco): "We're receiving a cancellation now. Stand by to prevent." The transmission "Stand by to prevent" indicates that the unit should stop their response, and should await further instruction from a supervisor before proceeding. Because the evidence cited by the parties contains conflicting inferences as to whether or not the officers actually heard this transmission, the court assumes for purposes of summary judgment that they did.[1]

When the officers arrived at the apartment complex, they saw some personal property hanging off the balcony of an apartment in the parking lot. Shea believed that the property belonged to Richard Deveney. Falco understood that Shea had made a previous call to this location involving Richard Deveney.

Shea shined his flashlight in a sliding glass door of the apartment in which Richard Deveney's girlfriend lived. A young man came out and told Shea that Deveney had been pounding on the door. Shea asked to be let into the building and the young man let him in.

An apartment resident told the officers that Deveney was at apartment No. 202. Falco looked into the sliding glass door of apartment 202 while Shea went to the front door. When Officer Shea approached the door of apartment 202, he and Officer Falco did not know Penny Guseman or that it was her apartment. Shea could hear a male voice in the apartment which he recognized to be Deveney's. Shea knocked and identified himself as a police officer. His intent was to investigate the 911 hang-up call and make sure everything was O.K.

Falco looked through the sliding glass door at the rear of apartment 202 and saw a woman sitting at a table drinking what Falco believed was a wine cooler. At that time Falco did not know what the relationship between Penny Guseman and Richard Deveney was, or whether somebody else might be in the apartment, or whether Deveney was armed.

Officer Shea identified himself as a police officer and requested entrance. A woman's voice stated she just couldn't open the door to anyone. Richard Deveney came to the door and said something to the effect, "hold on a minute." Deveney opened the door. Shea smelled marijuana as soon as the door opened. Shea asked if he could come in. Deveney stepped back from the door, which allowed Shea to enter the apartment. (Shea Depo. at 118–19).

Falco, from his vantage point at the rear sliding glass door, saw someone moving towards the front door, at which time Falco walked into the apartment building and up the stairs as Officer Shea was entering the apartment. It took Falco about fifteen to

---

**1.** Although Falco and Shea both testified that they did not remember receiving any further information from dispatch after the initial transmission, plaintiff has cited an affidavit of the dispatcher stating that as the officers were responding to the 911 hang-up call she "communicated with" Unit 266 by radio and made the transmission referred to above.

twenty seconds to walk to the front door. Falco did not hear any verbal exchange between Officer Shea and Richard Deveney. Normally, Officer Shea would have asked for permission to come in and make sure everyone in the apartment was O.K.

At the time of their entry, neither Falco nor Shea was in possession of a search warrant directing entry of or a search of the Guseman apartment, or an arrest warrant for any person known or believed to be within said apartment, nor did either believe any such warrant to be outstanding.

Possession of marijuana by a first-time offender is a misdemeanor offense under Kansas law and under Wichita city ordinance. Neither Shea nor Falco believed that the smell of marijuana alone was sufficient grounds for a warrantless search of the apartment.

Shea saw a large female jog from the dining room down a hallway inside the apartment. Falco entered the apartment and went after the female to the back of the apartment. Falco immediately smelled the odor of marijuana when he entered the apartment. Shea spoke with Deveney in the living room. Shea asked if he was the one who called 911; Deveney responded that he did. Shea patted down Deveney for officer safety due to the fact that the officers were then separated.

Falco went down the hallway of the apartment after Penny Guseman. Falco did not know if Penny Guseman was the tenant of apartment 202. Guseman was emerging from a hall bathroom. Falco noticed Penny Guseman had a can of hair spray in her hand and she sprayed it directly in Falco's face.[2] Falco perceived it as a deliberate act. Falco immediately questioned why he was sprayed, where the marijuana was, and who else was in the apartment. Falco formed the opinion that he had been battered.

Falco looked in the other rooms of the apartment to make sure no one else was there before dealing with Penny Guseman. Falco was bumped through the door of a bedroom by Ms. Guseman, who was behind

him. While Falco and Guseman were in the bedroom, Falco noticed some rolling papers that he associated with marijuana rolling papers on the floor in front of a dresser. Falco also noticed what appeared to be marijuana seeds on top of the dresser. Ms. Guseman was spraying hair spray in the air, saying Falco was not going to find any marijuana. Guseman was upset and screaming and spraying hair spray in her face. Falco was asking her to calm down. At this point, Guseman turned around and went into a closet. Falco was telling her to get out of the closet. She turned around, stood up, and screamed something about God and her Bible. She turned around and went back into the closet. She continued screaming about God and her Bible and then left the bedroom and went down the hallway. Shea, who was close to the front door, heard a struggle and yelling from the back of the apartment. He heard Falco say "battery."

Ms. Guseman ran back down the hallway toward the door of the apartment, which was still open. Officer Shea saw Guseman running for the open door, yelling and screaming as she ran. Because Shea felt Penny Guseman was fleeing the scene, he ran to block the doorway. Guseman collided into Shea from behind, so that momentum shut the door and Shea was smashed up against it.

Officer Falco was following Penny Guseman and Officer Shea directed his attention to Richard Deveney because he was angry and upset. At that point, Officer Shea placed Richard Deveney in handcuffs as a safety precaution.

Falco assisted in putting Penny Guseman in a chair to attempt to get her to calm down. As soon as Falco released pressure on Penny Guseman's arm, she came off the chair right at Falco. Falco got hit and brought Penny Guseman to the floor to handcuff her. Falco could not get her handcuffed by himself and he hit his radio asking for assistance to be sent. Dispatch put out Falco and Shea as in trouble and other officers started arriving.

---

**2.** Plaintiffs' Response to Falco's Motion attempts to dispute this allegation (¶¶ 11 & 12) at one point, and then goes on to state that it is undisputed (¶ 15).

Officer Shea observed Penny Guseman on her knees and Officer Falco pushing her all the way down and she was resisting.

Officer Shea grabbed one of Penny's arms and Falco grabbed the other arm and began to put his handcuffs on her. At some point, more officers began to arrive and eventually Penny Guseman was put in handcuffs. Because of her size, the officers connected two sets of handcuffs together so that Guseman could be handcuffed with her hands behind her back.

It is standard procedure of the police department to handcuff a detainee's wrists behind the back for the purpose of controlling the person. It is an unavoidable part of law enforcement to occasionally have a person placed on the ground in a prone position with their hands behind the back. The problems with dealing with a resistive suspect are: 1) officers being injured, and 2) suspects injuring themselves through their own actions.

When making an arrest inside a residence, a protective sweep is conducted to determine if anyone else is present, or if any weapons are present.

After being handcuffed, Penny Guseman continued to struggle, scream and kick her feet. Officer Shea was kicked by her.

Officer Eric Tims heard an officer in trouble dispatch from 911 on February 6, 1995, for 2250 S. Oliver, apartment 202. Officer in trouble is only used if a police officer needs emergency assistance. When Officer Tims got to the apartment, Penny Guseman was in custody. Penny Guseman was still "pretty hysterical, yelling, screaming." Officer Tims recalled that Officer Falco inquired if anyone had shackles. Tims' reaction was that Penny Guseman was "still flailing, being combative and needed to be further restrained." Officer Gorges went down to Lt. Martinez' car and got the shackles. Officer Tims does not believe that he assisted in placing shackles on Penny Guseman.

Shea assisted in putting shackles on Penny Guseman. The shackles were not attached to the handcuffs in a "hog-tie" position. After the shackles were in place, Guseman was still kicking, so Officer Shea stood on the chain which ran between her legs to restrict the movement of her legs to six to eight inches off the ground.

Lieutenant Orlando Martinez was in charge of Officers Shea and Falco on February 6, 1995. Lt. Martinez was out of the office on another call when he heard the tone over his radio for an officer needing assistance at 2250 South Oliver. Lt. Martinez was two blocks away at the time, so he drove his vehicle to the scene. He believes that he had his lights and siren activated. Lt. Martinez testified he thought there were three or four police vehicles in the parking lot of the apartment complex. He ran to the apartment.

When he first got to the doorway of the apartment, he saw three or four officers standing in the living room and a large white female laying on the living room floor. He saw Officer Shea sitting on her legs and she was kicking and flailing her legs, screaming, acting very emotional.

Lt. Martinez had heard Penny Guseman screaming, yelling in anger, highly emotional when he approached the apartment coming down the hallway. He felt that she was directing profanities at the officer who had subdued her. Lt. Martinez observed that Penny Guseman was handcuffed with her hands behind her back and that she was placed on her stomach. She was highly emotional, upset, screaming and yelling. Lt. Martinez observed that Penny Guseman was 5'8" to 5'9" and approximately 300 pounds.

Lt. Martinez was the ranking police officer on the scene with the right to assume management and supervision of the other police officers. Upon his arrival at the scene, Lt. Martinez did not believe that the other officers were doing anything wrong with respect to the restraint of Penny Guseman. He believed that she was in need of restraint and was of the opinion that she could harm either herself or the other officers present. Lt. Martinez recalled that a set of leg restraints (shackles) was produced and placed on Ms. Guseman, and he did not in any way dispute this action as he perceived that the use of shackles would be appropriate. Lt. Martinez recalled that Penny Guseman was still kicking two or three minutes after the shackles

were placed on her. Penny Guseman would calm down, "then all of a sudden go back to doing exactly the same thing, yelling, screaming."

Lt. Martinez never conversed with Penny Guseman regarding her physical and emotional distress, or made any attempt to calm her. He never gave an order to anyone to monitor her, to loosen the restraints or to place her in an upright position. It would have been feasible to put Ms. Guseman into a seated, upright position, and also to place her on her side. Lt. Martinez never gave any order to place Guseman in an upright position. At times, Martinez left the living room area where Ms. Guseman lay.

Officer Shea recognized that Lt. Martinez was in charge of the scene when he arrived there. Officer Shea being a new officer didn't know exactly what to do. The only orders that Lt. Martinez remembers making during the two or three minutes after the shackles were placed on Penny Guseman was to tell a couple of officers that they were not needed any longer. Martinez considered Falco, Shea and Wilson to be the only officers who needed to stay at the scene.

When Officer Tims first saw Penny Guseman, she had been screaming hysterically and was red in the face. In Tims' opinion, it was unlikely that Guseman would be able to remove herself from her position on the floor on her stomach with handcuffs behind her back. When shackles were requested, neither Falco nor Shea was close enough to Penny Guseman to be kicked by her.

Officer Tims observed obesity, bizarre and violent behavior, and combativeness in Ms. Guseman. The materials on sudden in-custody deaths given to Tims in his academy training indicated that handcuffed suspects exhibiting these characteristics should be continuously monitored and that the onset of positional asphyxia could occur over a period of minutes. From the time he entered the apartment until he left, Tims perceived that positional asphyxiation was a "possibility." [3] None of the officers at the scene discussed the concerns of positional asphyxia in Tims' presence or the need to continuously monitor Penny Guseman. Before leaving the scene, Tims gave no warning to anyone that they needed to monitor Penny Guseman, and he didn't hear anyone else give such a warning.

Although Officer Tims had received the academy training on positional asphyxia, he did not see any indication that Penny Guseman was suffering from any breathing problems at the time he was present at the scene. (Tims' Depo. at 66–67, 75, 84).[4] Officer Tims' saw other officers in the same room with Penny Guseman, and he believed that if she began having difficulty they could reposition her. Tims made no effort to calm or pacify Ms. Guseman while he was in the apartment and he does not remember any other officer doing so. Officer Tims was advised by Lt. Martinez that he could go back in service.

3. This is a somewhat questionable characterization of the deposition testimony. In his deposition, Tims was asked about the risk factors identified in the academy literature on positional asphyxiation that he had received before the incident and he conceded that he had observed all of those risk factors (such as obesity, violent behavior, etc.) at the Guseman apartment. The following then took place:

Q. Now, would it be fair to say based on your perception from the time you entered to the time you left that she, Miss Guseman that is, was placed in a position that positional asphyxia would be a definite concern?

A. It was a possibility.

Q. Many of the key factors that you were aware of were present in this case?

A. Yes.

Tims Depo. at 73. The deposition as a whole is less than clear about Tims' state of mind while he was in the Guseman apartment. Because it juxtaposes past and present tense and what Tims observed and what was in the academy literature, the above testimony is ambiguous concerning whether Tims was conscious of a risk of positional asphyxiation while he was in the apartment. Because defendants have not objected, however, and under the standards governing summary judgment, the court accepts plaintiffs' assertion of fact as true for purposes of this motion.

4. Plaintiff disputes the allegation that Tims did not see any indication Penny Guseman was suffering from breathing problems because in his deposition he stated that she was making "moaning sounds." Tims testified, however, that Guseman made moaning sounds as she was calming down and that he did not associate the sounds with discomfort or pain. Tims Depo. at 66–67.

At the time Penny Guseman was shackled, Lt. Martinez was standing in the living room of her apartment about 10 to 12 feet away from her. After the unnecessary officers were released from the scene, Officer Falco left the living room for another room of the apartment. Officer Shea remained in the living room-kitchen area of the apartment near Penny Guseman and Richard Deveney.

Officer Falco returned to the bedroom to find out what Penny Guseman was after in the closet, a knife, gun or evidence. He found two marijuana roaches, in plain sight, on the floor of the closet. Lt. Martinez followed Officer Falco to the bedroom and had a conversation with him. Falco told him that he and Shea knocked on the door of the apartment and that they were let in by Mr. Deveney, that they smelled the odor of marijuana, that Penny Guseman had approached with a can of hair spray and was spraying the air and that she sprayed Officer Falco's face. Lt. Martinez asked Falco what happened after Guseman had sprayed him and Falco recounted what had happened. Officer Falco showed Lt. Martinez a burned marijuana "roach" he saw in the bedroom. Lt. Martinez did not order Officer Falco to search in the bedroom.

When Lt. Martinez returned to the living room, Officers Shea and Wilson were in the living room. They may have been speaking to Mr. Deveney. Shea was taking notes and the officers could see Ms. Guseman. Officer Shea briefed Lt. Martinez on what had happened at the apartment. Richard Deveney attempted to get Ms. Guseman to calm down, but she would start yelling again.

Officer Shea asked Penny Guseman to calm down several times and placed his hand on her shoulder to try to get her to relax. Guseman repeatedly asked Shea to "summon Jesus Christ." During this time Guseman "could still wiggle around and her head was just checking out everything."

Richard Deveney informed Shea that Guseman was a schizophrenic. Shea asked Deveney what kind of medication Guseman was on; Deveney said he didn't know. Shea then asked where the medication was. Deveney said he would show him, but Shea said to just tell him where it was and Deveney pointed to somewhere in the kitchen. Shea went to the kitchen, which was next to the living room, to look for Ms. Guseman's medication. When Shea first went to the kitchen, Lt. Martinez was still in the living room with Ms. Guseman. Shea could still see Guseman and could hear her making the same statements referring to Jesus Christ. Shea looked in the kitchen cupboard for medication but did not find any. As he started to walk back out of the kitchen he saw a pill bottle on the dining room table. The pill bottle had Ms. Guseman's name on it but it was empty. Shea believes that he told Lt. Martinez that the pill bottle was empty and read off the contents of the bottle to Martinez.

Approximately 8 to 10 minutes after Lt. Martinez arrived at the apartment, Penny Guseman ceased to scream and yell. Lt. Martinez recalls that Penny Guseman was conversing with Richard Deveney when he first returned to the living room and that she was quieter than when he first arrived. He noticed that she became very quiet.

Officer Shea also noticed that Penny Guseman had calmed down and that she had become very quiet. He walked back over to her and spoke to her but did not get a response. Lt. Martinez stopped his conversation with Officer Shea, went over to Penny Guseman and laid his hand on her back to feel for respiration. He felt only a shallow respiration and ordered that the restraints be removed and that she be turned over. Shea attempted to place Penny Guseman on her side as soon as he perceived that she was having breathing problems. Shea attempted to roll her over but couldn't do it by himself. Other officers assisted in turning Penny Guseman over. When Falco came back into the living room, Guseman appeared to be unconscious. She was unhandcuffed, unshackled and rolled onto her back. Emergency Medical Services was summoned by Falco.

When Penny Guseman was rolled over, Lt. Martinez noted that she was gasping for air and her eyes appeared to be somewhat rolled back into her head. He instructed to check her pulse and listen for respiration sounds. Because Guseman had labored breathing, Lt.

Martinez ordered an ambulance by radio. When Falco stated that she had stopped breathing, Lt. Martinez ordered them to go ahead and start CPR efforts. Falco started chest compressions and Officer Wilson went to his vehicle and retrieved a first aid responder mask with which he proceeded to begin blowing air into Penny Guseman's lungs. Shea stood outside the apartment to flag down Emergency Medical Services.

The Fire Department rescue team arrived first and took over administering first aid to Penny Guseman. Shortly thereafter the Emergency Medical Services arrived.

Lt. Martinez notified his immediate supervisors of the incident and secured the scene for evidentiary purposes. Martinez left prior to Penny Guseman being taken out of the apartment.

Ms. Guseman was transported by EMS to a local hospital where she was pronounced dead shortly after arrival.

Dr. Corrie L. May, the Sedgwick County Coroner/Medical Examiner, conducted an autopsy on Ms. Guseman's body the following day. Dr. May's conclusion was as follows:

> It is my opinion that Penny S. Guseman asphyxiated during emotional distress when she was handcuffed and placed in the prone position by police officers. The contusions to the trunk and extremities did not contribute significantly to her death. Toxicological analyses revealed no alcohol, illicit drugs including marijuana, nor medications within blood. The manner of death was determined to be accident.

Dr. May's autopsy report gives "positional asphyxia" as a pathological diagnosis.

Plaintiffs do not allege and there is no evidence to show any similar prior incident in which an individual in custody of Wichita police officers suddenly died as a result of positional asphyxia.

Plaintiffs admit that none of the individual police officers named in the lawsuit intended that Penny Guseman be asphyxiated.

The 1994 Edition of the Wichita Police Department Policies and Regulations, which was in effect at the time of Penny Guseman's death, contained the following provisions:

a. "Officers may use only that force they reasonably believe necessary to make the arrest or to defend themselves or others from bodily harm while making the arrest." § 301.04.

b. "Only individuals lawfully-arrested may be handcuffed . . . ." § 302.06A.

c. "Officers shall treat all prisoners humanely and shall do everything possible to ensure their safety while in custody." § 3.1203.

d. "Officers shall exercise good judgment when restraining, handcuffing and shackling any person, and shall not secure or immobilize him/her to the point of causing injury." § 3.1205.

Officer Shea attended the Wichita Police in-service training course in the Spring of 1995 after the Penny Guseman incident. In that training he learned new material about positional asphyxiation from which he concluded that he would not leave anybody on their stomach regardless of their size for any longer than it would take to handcuff them. With respect to his training before Guseman's death, Officer Shea testified that he could have been provided more and better information on positional asphyxia, and that "it was like a new thing sweeping throughout the United States. I'm not blaming anybody, the instructor or anything like that, but no, I didn't have a proper understanding of it."

Lt. Martinez and Officer Falco attended mandatory training on positional asphyxia in April of 1995. Had Lt. Martinez been aware of the key factors for positional asphyxia and the ways to avert them, he testified that he probably would have handled the situation differently on February 6, 1995. Based on what he now knows about positional asphyxia, Officer Falco would not have left Penny Guseman on her stomach as long as he did, and he would not put a person in a prone secured position again.

## II. Plaintiff's Claims under 42 U.S.C. § 1983.

To prevail on a claim under § 1983, a plaintiff must show that the defendant, acting under color of state law, deprived the plaintiff of a right secured by the Constitution or

laws of the United States. *Pino v. Higgs*, 75 F.3d 1461, 1464 (10th Cir.1996).

### A. *Defendants Gorges and Wilson.*

Plaintiffs did not respond to the motions for summary judgment of defendants David Gorges and Dennis Wilson in which they asserted the defense of qualified immunity. In view of this failure to respond, the court finds that these motions should be granted as uncontested pursuant to D.Kan.R. 7.4.

### B. *Defendants Martinez, Shea, Falco and Tims.*

Each of the above-named defendants moves for summary judgment on the grounds of qualified immunity. In response, plaintiffs assert that four actions of the officers at the apartment violated Ms. Guseman's clearly established constitutional rights: an unlawful warrantless entry into the apartment without exigent circumstances or consent; a false arrest of Ms. Guseman without probable cause; the use of excessive force against Ms. Guseman; and a deliberate indifference to Ms. Guseman's safety while she was in custody. The last of these is said to be a violation of the due process clause of the Fourteenth Amendment; the rest are asserted under the Fourth Amendment (as incorporated in the Fourteenth Amendment).

■ The defense of qualified immunity protects "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To be "clearly established", the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. at 640. As a practical matter, this means that even if the plaintiff's rights were violated, a defendant is entitled to qualified immunity if officials of reasonable competence could disagree as to whether the con-

duct in question violated a clearly established right of the plaintiff.

Once the defendant has properly raised the defense in a summary judgment motion, the court applies a two-part framework. *See Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir.1996). First, the plaintiff must show that the defendant's conduct violated a constitutional or statutory right; and second, the plaintiff must show that the right was clearly established such that a reasonable person in the defendant's position would have known his conduct violated the right. *Id.; Anderson v. Creighton*, 483 U.S. 635, 638–40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Unless the plaintiff makes such a showing, the defendant prevails. In considering whether the plaintiff makes such a showing, we view the evidence in the light most favorable to the plaintiff. *See, e.g., Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 645–46 (10th Cir.1988). The question of whether the defendants are entitled to qualified immunity is a legal one. *Id.* at 646. Once the plaintiff clears this hurdle, "the defendant assumes the normal summary judgment burden of establishing that no material facts that would defeat his claim for qualified immunity remain in dispute." *Woodward v. City of Worland*, 977 F.2d 1392, 1396–97 (10th Cir.1992), *cert. denied*, 509 U.S. 923, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993).

### (1) *The Officers' Entry into the Apartment.*

■ Plaintiffs first contend that Shea and Falco's [5] entry into the apartment was a violation of Ms. Guseman's Fourth Amendment rights because the officers entered without a warrant and in the absence of exigent circumstances or consent. Although the court agrees with plaintiffs that the law governing such conduct was clearly established at the time of this incident, the uncontroverted facts show as a matter of law that Richard Deveney consented to the officers' entry and, thus, the entry was lawful. Whether or not

---

**5.** Plaintiffs do not contend that Officer Tims' or Lt. Martinez' entry into the apartment was un- lawful.

Deveney gave permission to enter is judged by an objective reasonableness standard: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. Waupekenay*, 973 F.2d 1533, 1537 (10th Cir.1992) (quoting *Florida v. Jimeno*, 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)). According to Officer Shea's uncontroverted deposition testimony, when he knocked on the apartment door he identified himself as a police officer and requested entrance. Although Penny Guseman indicated she was not going to let him in, Deveney said, "Hold on a minute," and opened the door. Shea then asked if he could come in. Deveney stepped back from the open door, which allowed Shea to enter. Although Deveney did not give any verbal consent, his actions in response to Shea's question unequivocally indicated consent to enter. *See e.g., United States v. Garcia*, 997 F.2d 1273, 1281 (9th Cir.1993) (officers' request to talk, combined with defendant saying "okay" and stepping back, gave rise to an inference of consent); *United States v. Donlon*, 909 F.2d 650, 655 (1st Cir.1990) (by opening screen door in response to police request to enter, defendant "effectively gave his permission to enter"); *United States v. Griffin*, 530 F.2d 739 (7th Cir.1976) (leaving the door open and stepping back constituted consent). From an objective viewpoint, there can be no question but that Deveney's actions constituted consent to enter the apartment.[6]

▬ Whether or not a consent is voluntary is a question of fact to be determined from all of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The relevant factors include whether there was physical mistreatment by the police, the use of violence or threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the person giving consent. *See United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir.1994). Plaintiffs have cited nothing that

would raise a genuine issue concerning the voluntariness of Deveney's consent. *See Valance v. Wisel*, 110 F.3d 1269, 1278–79 (7th Cir.1997) (in a § 1983 suit where defendant has come forward with evidence that there was consent to a search, the burden then falls upon the plaintiff to prove that no consent was given or that the consent was involuntary.) There is no evidence of coercion, threats or mistreatment by the police. Nor is there any evidence to suggest that Deveney lacked the ability to make an intelligent choice or that his free will was overcome by the police. (Notably absent from the materials cited is any evidence from Deveney concerning his state of mind when he gave consent.) Morever, even assuming plaintiffs could show that Deveney's consent was in fact involuntary, the defendants would be entitled to qualified immunity because they could have reasonably believed that Deveney's actions made their entry lawful. *See Valance v. Wisel*, 110 F.3d 1269, 1280 (7th Cir.1997). In sum, these defendants are entitled to summary judgment on the claim that their entry into the apartment violated Ms. Guseman's Fourth Amendment rights.

▬ The court further finds that after the consensual entry, Officer Falco's actions in following Ms. Guseman down the hallway of the apartment was reasonable under the "protective sweep" doctrine. A protective sweep is a brief search of premises, ordinarily occurring during an arrest, to ensure the safety of those on the scene. *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). The limited intrusion is justified by the "interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Id.* 494 U.S. at 333. The Fourth Amendment allows a protective sweep if police have "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences

---

6. Plaintiffs do not argue that Deveney lacked authority to consent. Moreover, in view of Deveney's apparent joint access to the apartment, the officers here could have reasonably believed that he had actual authority to consent. *See Illinois*

*v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (if facts as officer reasonably believes them to be would allow third party to consent, consent valid under apparent authority doctrine).

from those facts, reasonably warrant[s] the officer in believing that the area swept harbor[s] an individual posing a danger to the officer or others." *Id.* at 327 (internal quotations and citations omitted).

At the time Deveney let Shea into the apartment, the officers were aware of the following facts: a short time before they arrived someone had placed a 911 call from inside the apartment; the dispatcher had subsequently received a cancellation request on the 911 call; Deveney had made repeated 911 calls earlier that day and may have been intoxicated; Deveney often called 911 when he was fighting with his girlfriend; shortly before they arrived Deveney had been pounding on the door of his girlfriend's apartment; a female in the apartment had been sitting at a table in the living room when Shea first went to the door; a female indicated to Shea that she did not want to open the door to him; when Deveney let Shea in, a female jogged down the hallway to the back of the apartment and out of the officers' sight; and there was a strong odor of marijuana in the apartment. Under the facts known to the officers, it was reasonable for Falco to make a limited protective search of the apartment to ensure the officers' safety. The officers could reasonably be concerned that Ms. Guseman might be a threat to them. *Cf. Buie,* 494 U.S. at 333 ("In Terry [*v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] and Long [*Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)] we were concerned with the immediate interest of the police officers in taking steps to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them.") The fact that the officers were inside the apartment with Deveney's consent rather than to make an arrest does not change this. *See Chamberlain v. City of Albuquerque,* No. 92–2089, 991 F.2d 805, 1993 WL 96883, at *11 (10th Cir. Mar.29, 1993) ("Once inside legally, here with Plaintiff's consent, 'the potential for danger justified ... a limited protective sweep.' "); *Unit-*

*ed States v. Patrick,* 959 F.2d 991, 996 (D.C.Cir.1992) (same). Nor is the analysis altered by plaintiffs' allegation that the officers entered the apartment and pursued Ms. Guseman only because they were interested in finding marijuana. For purposes of the Fourth Amendment, "[t]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996). In sum, Officer Falco's incursion into the hallway was reasonable under the Fourth Amendment. Additionally, the court finds that Falco is entitled to qualified immunity for his actions because he could have reasonably believed them to be lawful.

### (2) *Unlawful Arrest.*

■ Plaintiffs next contend Ms. Guseman was arrested without probable cause in violation of the Fourth Amendment. Officer Falco testified that when he went down the hallway, Ms. Guseman emerged from a bathroom and with a can of hair spray and that she sprayed him in the face. Falco thought the act was deliberate. Officer Shea, who was standing near the front door at the time of the incident, testified that he heard his partner say "battery" and heard a struggle and yelling from down the hallway. Shortly thereafter, Shea saw Ms. Guseman running down the hallway toward the front door.[7] In an attempt to controvert the evidence that Ms. Guseman battered Falco, plaintiffs cite the fact that a swab was taken on Officer Falco's face after the incident but no test results have been produced, and several officers who were in the apartment that night acknowledged that they did not notice any sign that Falco had been sprayed. These facts alone, however, are insufficient to create a genuine issue of fact. An absence of such objective evidence of injury is not incompatible or even improbable with the commission of the battery as described by Officer

---

**7.** The undisputed facts show also that the officers had probable cause to arrest Ms. Guseman for

battery in the living room after she came out of a chair and hit Officer Falco.

Falco. Plaintiffs are inviting speculation rather than pointing to evidence from which a jury could reasonably conclude that a battery did not occur.

Plaintiffs also argue that the arrest of Ms. Guseman was unlawful because Kansas law gave her the right to repel Falco as an unwanted intruder in her home. This is likewise unavailing. The court has already determined that Officer Falco was lawfully present in the hallway when the confrontation with Ms. Guseman occurred. Insofar as plaintiffs are arguing that Ms. Guseman acted in good faith and therefore did not have the criminal intent to commit a battery, such an argument is not determinative of whether Falco's actions comported with the Fourth Amendment. "Probable cause to arrest exists when officers have knowledge of facts that would warrant a person of reasonable caution in the belief that an offense has been or is being committed." *United States v. Bruce*, 78 F.3d 1506, 1508 (10th Cir.) (quotations omitted), *cert. denied*, —— U.S. ——, 117 S.Ct. 149, 136 L.Ed.2d 95 (1996). The uncontroverted facts show that Officer Falco had probable cause to believe Ms. Guseman battered him. Her subsequent arrest was therefore reasonable under the Fourth Amendment. *See e.g., United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (Fourth Amendment does not prohibit warrantless arrest for misdemeanor committed in officer's presence.)

(3) *Excessive Force.*

Plaintiffs' third allegation under § 1983 is that the defendant officers violated Ms. Guseman's Fourth Amendment rights by using excessive force. Plaintiffs contend that the use of leg restraints was unnecessary and that leaving Ms. Guseman restrained and in a prone position amounted to the use of excessive and deadly force.

■■■ In addressing an excessive force claim, the issue is whether the arresting officer's actions were objectively reasonable. *See Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Relevant factors in making this determination include the severity of the crime, whether the subject posed an immediate threat to the safety of the officers or others, and whether the subject was resisting arrest or attempting to evade arrest. *Id.* 490 U.S. at 396. In *Graham,* the Supreme Court further explained:

> [T]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... With respect to a claim of excessive force ... [n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers ... violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97 (internal citations and quotations omitted).

■■■ It is undisputed that Ms. Guseman exhibited bizarre behavior and strenuously resisted the officers' attempts to arrest her. Even after being handcuffed in a prone position, she continued to kick and scream and she kicked Officer Shea. Under these circumstances, handcuffing and shackling Ms. Guseman was reasonable because of her continued resistance. *Cf. Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir.1997) (Police's actions in handcuffing and shackling arrestee "amount to an objectively reasonable response to the escalating situation they faced.") Plaintiffs argue that shackling was unnecessary because the officers could have avoided being kicked by moving away from Ms. Guseman. The Fourth Amendment, however, did not require the police to avoid Ms. Guseman so as to oblige her continued resistance to arrest. The defendants' actions in handcuffing and shackling Ms. Guseman in a prone position were objectively reasonable under the circumstances. *Cf. Phillips*, 123 F.3d at 593 ("Restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest.").

Plaintiffs further argue that even if this prone restraint was justified initially, it subsequently became excessive—and ultimately deadly—force to leave her in that position after she had ceased resistance. Officer Shea is particularly culpable, they argue, because he had received training on the risk factors for positional asphyxiation and he "knowingly and willfully disregarded these risks[ ] and left [Ms. Guseman] there to die." Thus, according to plaintiffs, Shea "knowingly used deadly force against a defenseless human being."

The court notes that there are two recent cases dealing with similar claims. One is *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir.1997), where the plaintiff, as in the instant case, died in police custody shortly after being arrested and placed in a prone position with handcuffs and leg restraints. The *Phillips* court rejected a claim that the police's actions constituted the use of "deadly force" because "[n]one of the plaintiffs' materials supports that restraining an individual in a prone position 'carr[ies] with it a substantial risk of causing death or serious bodily harm.'" *Id.* at 594.[8] The court went on to address "whether the officers' conduct while Mr. Phillips was on the floor can be deemed unreasonable" and held that it could not because "[t]he record ... will not support an inference that the officers failed to take reasonable steps to monitor Mr. Phillips." *Id.* Thus, the officers' actions were objectively reasonable and did not violate the Fourth Amendment. The court further held that no claim for violation of Due Process (and its "deliberate indifference" standard) could be made on these facts because such a claim was precluded by *Graham v. Connor, supra.*

Another similar case is *Cottrell v. Caldwell*, 85 F.3d 1480 (11th Cir.1996), where a plaintiff in handcuffs and leg restraints died of positional asphyxiation while being transported in a police car. Insofar as a claim under the Fourth Amendment was concerned, the Eleventh Circuit found in favor of the defendants, rather summarily, saying there was no genuine issue of material fact concerning excessive force. *Id.* at 1492. (This conclusion appears to have stemmed from the plaintiff's extensive resistance to arrest before being subdued. *See id.* at 1488, 1492.) As for the plaintiff's due process claim of custodial mistreatment under the Fourteenth Amendment (in which it was alleged that the officers had been deliberately indifferent to plaintiff's safety), the court noted that the defendants had not had any training about the danger of suffocation in transporting prisoners, and it held as a matter of law that the plaintiff had failed show the defendants were consciously aware of and disregarded such a risk. *Id.* at 1491.

Plaintiffs correctly note that there are factual differences between this case and the two above. Unlike *Phillips*, there is evidence in this case from which a jury could find that the officers left the plaintiff unattended for at least a couple of minutes while she was restrained on the floor. And in this case, unlike *Cottrell*, two of the officers on the scene had been given training on positional asphyxiation before the incident occurred.

The court concludes for the reasons stated below that, assuming all of the plaintiffs' allegations are true, the officers' actions in leaving Ms. Guseman restrained in the manner alleged could be found to be a violation of her Fourth Amendment rights. Despite this, the court finds that the individual defendants are entitled to qualified immunity for any such violation and are entitled to judgment against the plaintiffs.

"The 'reasonableness' of a particular seizure depends not only on when it is made, but also on how it is carried out." *Graham,* 490 U.S. at 395. To determine the constitutionality of a seizure the court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). Although the manner of restraint in this case

---

8. According to the court, the materials relied on by the plaintiff typically involved officers using choke holds and hogties or transporting an individual in a prone position, and other factors such as drug use or physical problems usually contributed to the deaths. *Id.* at 594, n. 1.

was clearly reasonable—if not unavoidable—at the outset of Ms. Guseman's arrest, at some point the legitimate justification for having her in that position began to subside. The defendants have not identified any law enforcement interest that required leaving Ms. Guseman restrained in a prone position for an extended period; in fact they concede it would have been feasible to have placed her on her side. This appears to have been true shortly after Ms. Guseman was restrained, and was certainly true by the time she ceased resistance and began to calm down (according to Lt. Martinez, approximately 8–10 minutes after he arrived at the apartment). The materials cited by plaintiffs and the tragic events in this case show that under certain circumstances there is a risk of death from such restraint because it makes breathing more difficult. Even if the risk is low in the sense that only a small percentage of persons so restrained will suffer harm, the fact that death is a possibility weighs against use of this method after the legitimate interests that made it necessary in the first instance have evaporated. Although the materials in the record suggest that close monitoring of the detainee can prevent suffocation, and the Seventh Circuit intimated in *Phillips* that reasonable monitoring precludes any Fourth Amendment violation, the potentially rapid onset of asphyxiation and the lack of obvious warning signs that it is occurring could make it unreasonably dangerous to use this method of restraint for a prolonged period in the absence of any reasonable justification for it.[9] Under the facts alleged by plaintiffs, Ms. Guseman was unnecessarily left in a position that exposed her to a risk of death and was allowed to remain in that position until she suffocated. The court concludes that a reasonable jury could find facts that would make the manner of affecting the arrest an unreasonable seizure under the Fourth Amendment.[10]

Even where an officer violates an individual's rights, however, the law provides immunity from damages unless the conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In this case, it is not enough to say that a reasonable officer would have known that the Fourth Amendment prohibits excessive force because " 'if the test . . . were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow,*' and would not reasonably allow officials to anticipate when their actions may give rise to liability for damages." *Lawmaster v. Ward,* 125 F.3d 1341, 1350–51 (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Rather, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640. For the law to be "clearly established" in this circuit, a Supreme Court or Tenth Circuit decision generally must be on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains. *Garramone v. Romo,* 94 F.3d 1446, 1451 (10th Cir.1996).

At the time of this incident it was not clearly established that this method of restraint could violate the Fourth Amendment. Plaintiffs cite no case holding such conduct to be a constitutional violation and, in fact, *Phillips* and *Cottrell* found similar conduct to be lawful under the Fourth Amendment. The court rejects plaintiffs' argument that the officers are not entitled to immunity because they should have known that the use of such "deadly force" was un-

9. The defendants do not contend that any type of exigent circumstances or danger to the officers necessitated leaving Ms. Guseman in a prone position. Accordingly, the court need not consider under what circumstances it might be reasonable to leave a detainee in such a position.

10. Plaintiffs' argument about Officer Shea's allegedly culpable state of mind are misplaced. Under the Fourth Amendment, the relevant ques-

tion is whether the officers' actions are objectively reasonable in light of the circumstances confronting them, without regard to their underlying intent or motivation. *Graham,* 490 U.S. at 397. Thus, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*

lawful. Almost any type of force can cause death in aberrant circumstances. The limits on the use of "deadly force" under the Fourth Amendment, however, apply only to "that force which is reasonably likely to cause death." *Vera Cruz v. City of Escondido*, 126 F.3d 1214, 1217 (9th Cir.1997). That cannot be said of the prone method of restraint even though it has the potential to cause death in certain circumstances. There is no evidence that the probability of death is so high as to be considered "likely" when such restraint is used. *Cf. Phillips*, 123 F.3d at 593–94 (finding prone restraint is not "deadly force"). Given the state of the law, a reasonable officer in the defendants' position could have believed their conduct to be lawful. The law provides that law enforcement officials should not be held personally liable when they reasonably but mistakenly believe their actions are lawful. *Anderson*, 483 U.S. at 641. The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Under the circumstances, the individual defendants are entitled to qualified immunity on this claim.[11]

*(4) Due Process Claim.*

 Plaintiffs' final claim against the individual defendants under § 1983 alleges a

violation of Ms. Guseman's right to due process under the Fourteenth Amendment. That right was violated, plaintiffs contend, by the defendants' deliberate indifference to Ms. Guseman's safety while she was in custody.

For the same reasons expressed in *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir.1997), the court concludes that the Due Process Clause is inapplicable to plaintiffs' claim of custodial mistreatment. *Phillips* recognized that at some point after a person is arrested the question of whether the confinement is constitutional passes from the Fourth Amendment to the Due Process Clause, but held under similar facts that the point "was not crossed in this case, and the Fourth Amendment's reasonableness standard remains the sole standard by which to measure the officers' actions." *Id.* at 596. *Cf. Barrie v. Grand County, Utah*, 119 F.3d 862 (10th Cir.1997) (majority applied due process standard where a pretrial detainee committed suicide in a holding cell). There is no material distinction between *Phillips* and this case. Ms. Guseman may have been in custody for a slightly longer time than the plaintiff in *Phillips*, but in both cases the death of the plaintiff occurred during the seizure by the police. *Cf. Graham*, 490 U.S. at 389–90. "[A]ll claims that law enforcement officers have used excessive force—

11. The Tenth Circuit has suggested that in excessive force cases the inquiry into whether the officer used excessive force is essentially the same as whether he is entitled to qualified immunity. *See Mick v. Brewer*, 76 F.3d 1127, 1135, n. 5 (10th Cir.1996). This is effectively true in the overwhelming number of excessive force cases because the plaintiff typically alleges that the defendant engaged in conduct that no reasonable officer could believe to be lawful (e.g. unprovoked beating of the plaintiff).

The determination of whether a particular seizure is reasonable under the Fourth Amendment, however, is distinct from the inquiry into whether the law was so clearly established that any reasonable officer would know that the conduct violates the Fourth Amendment. Where the law is not clearly established, an officer will be entitled to immunity notwithstanding that his conduct may be unreasonable under the Fourth Amendment. *Cf. Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991) (officers who reasonably but mistakenly concluded that probable cause was present were entitled to immunity).

This distinction is illustrated by *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), dealing with the use of deadly force. That case arose when a police officer shot and killed an unarmed burglary suspect who was attempting to flee. A state statute in effect at the time authorized police officers in Tennessee to use "all means necessary" to make an arrest. The family of the decedent sued under § 1983, claiming that the defendants, including the officer, violated the decedent's Fourth Amendment rights by using deadly force to make the arrest. The Sixth Circuit dismissed the defendant officer from the suit on the grounds of qualified immunity because he could have reasonably believed his actions to be lawful. *See id.* 471 U.S. at 5; 600 F.2d 52 (6th Cir.1979). Notwithstanding the officer's entitlement to immunity, the Supreme Court made clear on appeal that the use of deadly force under these circumstances was unreasonable under the Fourth Amendment. *Id.* 471 U.S. at 13.

deadly or not—in the course of an arrest, investigative stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id.* 490 U.S. at 395. Accordingly, the individual defendants are entitled to judgment as a matter of law on plaintiffs' due process claim and on any Eighth Amendment claim.[12]

### C. *Defendant City of Wichita.*

Plaintiffs next contend that the City of Wichita is liable under § 1983 for Ms. Guseman's death because "the City acted with deliberate indifference toward the lives and safety of persons with whom its police officers were likely to come in contact when, having learned that an existing arrest practice could cause the death of such persons, the City took no action to change the policy, or to instruct its officers of the risks associated with the practice." Pl. Resp. at 6.

■ "[T]he inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). To establish a city's liability under § 1983 for inadequate training of police officers in the use of force, a plaintiff must show (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training. *Zuchel v. City and County of Denver,* 997 F.2d 730, 734–35 (10th Cir.1993).

■ Plaintiffs have failed to produce evidence from which a reasonable jury could find that the third element above is satisfied. In most cases, a plaintiff meets the burden of proving "deliberate indifference" by showing that a pattern of constitutional violations has put the municipality on notice that its training is inadequate. *See Allen v. Muskogee, Oklahoma,* 119 F.3d 837, 846 (10th Cir.1997) (Kelly, J., dissenting) (citing *Board of the County Comm'rs v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1390, 137 L.Ed.2d 626 (1997)). This is because a city's continued adherence to an approach that it knows has failed to prevent tortious conduct by its employees gives rise to a rational inference that the city is deliberately indifferent to the continuing violations occurring under its policy. *See Brown,* 117 S.Ct. at 1390. There is no evidence here of any similar prior incident in which an individual in custody of Wichita police officers suddenly suffered serious injury or death as a result of positional asphyxia. Thus, the City cannot be said to have been on notice of an inadequate training program by virtue of a history of constitutional violations by its officers.

■ A plaintiff can succeed in proving a failure-to-train claim without showing a pat-

---

**12.** Even if the Due Process Clause were applicable, these defendants would be entitled to qualified immunity. At the time of the incident, defendants Martinez and Falco had not received any training on positional asphyxiation and there is no evidence from which a jury could reasonably find they were deliberately indifferent to Ms. Guseman's safety. *See Cottrell,* 85 F.3d at 1491. As for officers Tims and Shea, even assuming they recognized that Ms. Guseman's position made asphyxiation a possibility, they could have reasonably (although mistakenly) believed that Ms. Guseman was being adequately watched and was not in jeopardy. There is no evidence Officer Tims ever saw Ms. Guseman unattended. He could have reasonably believed that Officer Shea was adequately monitoring her. Officer Shea stayed in the same room with Ms. Guseman for all but a few minutes of the incident, during which time she continued to talk to Shea or to Richard Deveney. Shea only left the room for a few minutes for the purpose of finding medication for Ms. Guseman. When he first went into the kitchen, he could see Ms. Guseman and could still hear her talking. He then found an empty pill bottle in the kitchen and read the contents of it to Lt. Martinez. At that time, one or more of the defendants noticed that Ms. Guseman had become very quiet. The court concludes that these facts support a claim of immunity for Officer Shea. Although he was tragically (and perhaps negligently) mistaken as to Ms. Guseman's well-being, Officer Shea could have reasonably believed that she was not having breathing difficulty and that his actions were lawful.

tern of constitutional violations only "in a narrow range of circumstances." *Brown,* 117 S.Ct. at 1391. In essence, this requires the plaintiff to show "that in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

The undisputed facts here will not support a finding of deliberate indifference under *Canton.* Plaintiffs attempt to meet this standard by citing the city's awareness of the article warning of sudden in-custody deaths, including death by positional asphyxiation. The city learned of this article in June of 1994 and was informed at that time that the KLETC was going to incorporate the information in its curriculum. Contrary to plaintiffs' assertion that the city took no action before Ms. Guseman's death to inform its officers of the risks associated with maximal prone restraint techniques, the undisputed facts show that the city immediately began including this information in its academy training for police recruits. It was included in a training session ending in August of 1994 and again in an October 1994 session. For reasons that are not disclosed by the record, the city did not include the material in the October 1994 in-service training session for veteran officers—the only such session occurring before Ms. Guseman's death—despite the fact that the city instructors had engaged in some discussion in June about including it in that session. At most, this failure to include the information in the first available in-service training session could be considered negligence on the city's part. But *Canton* and its progeny make clear that more is required for municipal liability under § 1983. *See Brown,* 117 S.Ct. at 1390 ("A showing of simple or even heightened negligence will not suffice."). It would not have been "known or obvious" to a reasonable policymaker that a failure to provide immediate further training would likely result in a deprivation of constitutional rights. Such an eventuality would have seemed remote prior to this incident.

Despite the fact that the city had no policy prohibiting restraint techniques of the type challenged, no person had ever before died of positional asphyxiation while in Wichita police custody. There were no known court decisions finding that the use of prone restraint techniques on a person who had resisted arrest was a violation of the person's constitutional rights. The materials in the record indicate that positional asphyxiation is a relatively rare event brought on by a unique combination of circumstances. Plaintiffs cite no evidence that the dangers of positional asphyxiation were widely understood prior to this incident or that police departments in general considered such information to be an essential part of their training regimens. The City had adopted and taught officers its policies governing the use of force in making arrests, including the directives that "Officers may use only that force they reasonably believe necessary to make the arrest or to defend themselves or others from bodily harm while making the arrest"; that "Officers shall treat all prisoners humanely and shall do everything possible to ensure their safety while in custody"; and that "Officers shall exercise good judgment when restraining, handcuffing and shackling any person, and shall not secure or immobilize him/her to the point of causing injury."

Plaintiffs understandably believe that Ms. Guseman would not have died had the city given its officers more or better training on positional asphyxiation. But even if true, this fact alone does not demonstrate deliberate indifference on the part of the City. "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Canton,* 489 U.S. at 391–92. The facts of this case do not bring it within the "narrow range of circumstances" in which liability may attach without any pattern of past constitutional violations. The city is therefore entitled to summary judgment on plaintiffs' § 1983 claim.

**1262**

### III. *Plaintiffs' State Law Claims.*

In addition to the claims under federal law, plaintiffs assert claims against the defendants under state law. Although the court has the authority to hear such claims under its supplemental jurisdiction, 28 U.S.C. § 1367(a), the City of Wichita argues that the court should refrain from exercising supplemental jurisdiction.

■ Whether or not supplemental jurisdiction should be exercised is within the court's discretion. *See Brinkman v. State Dept. of Corrections,* 863 F.Supp. 1479, 1488 (D.Kan.1994). The court is expressly authorized to decline to exercise supplemental jurisdiction over a state law claim if the court has dismissed all claims over which it had original jurisdiction. 28 U.S.C. § 1367(c)(3). Discretion to try state law claims in the absence of any federal claims should only be exercised in those cases in which, given the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction. *Thatcher Enterprises v. Cache County Corp.,* 902 F.2d 1472, 1478 (10th Cir.1990). Generally, when federal claims are eliminated before trial, the balance of factors to be considered will point towards declining to exercise jurisdiction over the remaining state law claims. *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). "Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Thatcher Enterprises,* 902 F.2d at 1478. After considering the relevant factors in this case, the court finds no compelling reason to exercise its supplemental jurisdiction and determines in the interest of comity and federalism that plaintiffs' remaining state law claims be heard in state court.

### IV. *Conclusion.*

The motions for summary judgment by defendants City of Wichita (Doc. 53), Robert Shea (Doc. 55), Dennis A. Wilson (Doc. 57), Orlando Martinez (Doc. 59), David Gorges (Doc. 61), Brian C. Falco (Doc. 63), and Eric S. Tims (Doc. 65) and hereby GRANTED. Plaintiffs shall take nothing on their claims against these defendants under 42 U.S.C. § 1983 and such claims are dismissed on the merits. The court declines to exercise supplemental jurisdiction over plaintiffs' claims against these defendants under state law; such claims are dismissed without prejudice.

In view of the court's ruling on defendants' motions, Plaintiffs' Motion for Summary Judgment (Doc. 52) is DENIED.